*297 OPINION OF THE COURT
Thomas H. Scuccimarra, J.
Joann Patrick and William W. Patrick, the claimants herein, are the administrators of the estate of William C. Patrick, their son, known as Billy, who died on September 8, 2001 while in the custody of defendant’s agents, the New York State Taconic Developmental Disabilities Services Office (hereafter Taconic DDSO) of the Office of Mental Retardation and Developmental Disabilities (hereafter OMRDD). Claimants allege that their son died because staff members at the Verbank Group Home operated by Taconic DDSO used excessive force to restrain him in his room, were inadequately trained in restrictive physical intervention techniques, and negligently failed to maintain records that would have alerted staff to the possible harmful consequences to decedent of the use of physical intervention as a restraint mechanism. Trial of the matter commenced on March 22, 2005, and continued in June 2005. This decision relates only to the issue of liability.
Findings of Fact
On September 8, 2001, Billy Patrick, claimants’ son, was 35 years old and had been a resident at the Verbank Group Home for approximately four years. He had been diagnosed as brain damaged since birth and suffered from developmental disabilities. Two developmental aides, Raymond Morse and Shelia Avinger,[2] cared for the 10 residents at the home, as did another staff member named Kenny who was not present on that date. Morse and Avinger were working the 3:30 p.m. to 11:30 p.m. shift that evening.
It was unclear exactly what kind of training the aides had received prior to their service at the home, although Morse did mention some training he had attended in June 2001 relative to SCIP-R techniques,[3] a curriculum taught to those working with individuals receiving services through the OMRDD. There was no indication that either aide was certified in SCIP-R techniques or the more advanced specialized and restrictive techniques.
Additionally, each aide told different versions of the events that transpired that evening, and the story told by each in any event was in conflict. For the most part, however, the court *298 found that these conflicts were more the product of the aides’ own distress over what occurred, rather than deliberate attempts to veil the truth.
During dinner, which took place between 5:00 p.m. and 5:30 p.m., Billy asked Morse to sit next to him and he did. After the residents — or “consumers” as they are called by staff — had eaten supper, one of them named Eddie came to Morse, who was in the office on the ground floor, and told him that Billy Patrick and another resident named Donald were having a “problem.” Mr. Morse went upstairs to the consumers’ rooms on the second floor to investigate. It was his understanding that some type of altercation — whether verbal or physical or both— was ongoing and needed immediate attention.
When Morse got to the second floor, he met Donald, the individual with whom Billy was supposedly having the problem, in the hallway. In a statement given to the Dutchess County Sheriff’s Department describing what happened next, Morse reported that Donald said to him that Billy was “bothering him.” (Exhibit 8.) At trial, Morse indicated that Donald told him that Billy was in the room but did not elaborate further, nor did Morse question him further.
Without knocking at the open door or otherwise announcing himself, Morse entered Billy’s room, and saw Billy sitting on the bed. When Morse asked Billy “if something was going on, if something was bothering him,” at trial Morse indicated that Billy responded first by saying something about “him and Donald had an altercation.” (T at 67.)[4] When reminded of prior deposition testimony taken June 4, 2004 Morse corrected himself and said that rather than saying anything in response to Morse’s inquiry as to “what’s wrong,” Billy responded by coming off the bed and flailing at Mr. Morse. This appears consistent with what he reported to the Dutchess County Sheriffs Department on the day of the incident. (Exhibit 8.)
As drawn and described by Morse, Billy’s room was approximately 10 feet by 12 feet and contained two beds, two dressers and two windows. (See exhibit E.) Upon entering the room, Donald’s bed was immediately in front of the door, and his dresser was against the right wall. Billy’s bed was to the left against the other wall. That wall had a window as well. Billy’s dresser, and an additional window, were between Billy’s bed and Donald’s bed.
*299 Morse testified that when he entered the room, Billy got up from the bed where he had been sitting and, “mov[ing] a little faster than usual,” walked toward the window between the beds. (T at 75.) He was raising his left fist and arm toward the window. Mr. Morse said he was aware of Billy’s prior history of breaking windows. Morse said: “I got between him and the window so he wouldn’t put his arm through it and hurt himself.” (T at 76.) Morse grabbed his arms — crisscrossing them — to set him on the bed. After Billy sat down on the bed, Morse released his arms. (T at 79.)
While Morse stood and Billy sat, he continued to ask Billy what was wrong, and at trial Morse did not recall Billy responding. Morse was then reminded that, according to his deposition testimony, Billy was saying: “I want to talk to Kenny” — referring to the other aide not present on that day.
When Shelia Avinger came in the room shortly thereafter, Morse said he had “probably moved off to the right side” to give Billy a little room. (T at 86.) Seeing Avinger, Morse said, Billy immediately jumped off the bed, went over to her with his arms raised, looking like he was going to assault her. Morse then “used a SCIP technique” by “wrapping] his arms.” (T at 87.) Asked to describe what that entailed, Morse said that he came behind Billy, pushed his arms in front of him, and grabbed his wrists.
Morse said:
“I brought him back a little bit and then he slid down onto the floor ... He was struggling a little bit ... we were between [the] two beds [on the floor] and he goes down onto his stomach and he starts swinging his arms, so you don’t want him to hurt himself, trying to hit like the bottom of the bed. So I took and proceeded to take and try to regroup his arms . . . He was laying on the floor now . . . He was on his stomach.” (T at 88-89.)
Once they were on the floor, with Billy laying on his stomach, Morse said he was off to Billy’s left side, trying to regrab Billy’s arms, which had been released when Billy went down. Billy appeared to still be struggling “a little bit” as they went down to the ground. Thus while Morse had initially released him, in order to see if Billy was going to stop after the release, Morse explained that he placed himself “at an angle on him” — between the middle of Billy’s back and up — in an effort to control Billy’s hands.
*300 In the meantime, Avinger was trying to hold Billy’s legs to stop him from kicking.
Although Morse did not see it, he recalled that at some point Billy bit his left arm. At trial, he could not really say how he knew that Billy bit his own arm, but thought that maybe “Shelia said that he was biting his arm.” (T at 95.) At the time, Morse was at an angle over the top of Billy, with some of his own upper torso over the back of Billy’s upper torso, and Avinger was holding on to Billy’s legs.
When read a portion of his deposition testimony to the effect that he himself had noticed Billy biting his arm, Morse said he could not remember whether he saw it or Avinger told him.
In any event, after Billy bit his arm, Morse pushed his head down for “just seconds” to get him to release his bite and successfully pulled out his arm — in at least one version of events recalled by Morse. “There was a little more going on” than stopping the intervention at that point Morse said at trial. Billy “rolled . . . [Morse] over on top of him . . . like . . . [Morse] was just a pretzel or something. We kept rolling back and forth.” (T at 99.)
Billy’s head was toward the door and his feet were toward the window in between the two beds. (T at 123.) Morse was concerned that Billy would hit the metal on the beds. The whole time Avinger was trying to hold or was holding Billy’s legs, there was a struggle going on, but they did not move from the floor area. Billy kept saying: “I want to talk to Kenny” in response to Morse and Avinger’s queries as to “what can we do?” or “will you calm down.”
Morse released him “at the end” “because he had calmed down.” “At the end,” Morse noticed Billy was blue, but it did not occur to Morse why Billy was blue even though Morse was trained in CPR. They rolled him over to start CPR. When the physical intervention ended, Billy was no longer talking, but Morse said he “thought he was conscious.”
When asked if there was anything else he wanted to tell the court, and prodded as to whether Billy vomited at any point, Morse said he vomited “during the struggle . . . When we were on the floor and he was on his stomach.” Morse narrowed the timing of Billy’s vomiting to after Morse pushed Billy’s head down on his arm, during the time he was rolled over and turned blue. Morse agreed that Billy was “conscious and vomiting and blue” when asked. (T at 104.) The whole intervention took, as Morse recalled, between five and seven minutes. (T at 105.)
*301 As part of the investigation by the Dutchess County Sheriffs Office, Mr. Morse was filmed on videotape two days after the events reenacting the intervention imposed upon Billy Patrick. (Exhibit 13.) One of the sheriffs deputies took the part of Billy Patrick, while Morse narrated and demonstrated the physical moves he made.
After viewing the videotape at trial, Morse recalled that he had performed the Heimlich maneuver on Billy, and that it appeared that Billy was not conscious when Morse rolled him over and first saw that he was blue and then attempted CPR.
At trial Morse then agreed that with regard to the narrative he gave during the reenactment that it “was more accurate than any statement that I can give you three years later.” (T at 110.) During the reenactment, Morse indicated that Billy vomited after the intervention stopped and while Morse was performing CPR — as opposed to during the struggle as he had first said at trial. (T at 111.) Throughout the narrative Morse makes reference to his historic and present inability to kneel.
Morse estimated that Billy was approximately five feet, six inches tall and weighed 140-160 pounds. Morse was five feet, eight inches tall and weighed approximately 220 pounds. Shelia Avinger estimated that she was about five feet, 572 inches tall and weighed approximately 150 pounds.
Morse said, as noted earlier, that he was aware that Billy had broken windows in the past. He was not aware, however, of any problems relating to a physical intervention with Billy in March 1999. As far as he knew, there were no restrictions on physical interventions with Billy. Although when Morse first entered the room, Billy hit him — “nicked” his face as he reported to the sheriffs department — Morse said it did not make him angry it was just what “happens in our job.” Morse admitted that it never occurred to him that the reason he could not get what was bothering Billy “out of him” was that there was nothing wrong. (T at 127.)
Shelia Avinger had worked as a developmental aide at Verbank for approximately 27a years on September 8, 2001. She had not worked there in March 1999, but had started in July 2000. She recalled sitting on the living room couch after dinner that evening on the first floor, checking movie timetables on the telephone, when Eddie told her that something was going on between Billy and Donald. She was told that “Billy was bothering Donald.” Moments earlier, she had seen Morse walk past her quickly going up to the second floor, but had not had any *302 conversation with him. There were three to four people in the living room at the time. After hanging up the telephone, and without inquiring further of Eddie, she got up and went upstairs. She agreed that the term “bothering” could mean anything, from a verbal confrontation to some type of physical contact. All she thought at the time was that she needed to get up there to see what was going on. (T at 139.)
Using a different staircase than the one used by Morse, when she got up to the second floor she saw Donald in the hallway near the bathroom and another consumer’s room, vacuuming. After she told Donald to turn off the vacuum, he said Billy was bothering him, and that he “won’t leave me alone.” (T at 143.) No other particulars were sought nor were any offered.
As soon as she walked into Billy’s room she saw Billy standing with his back against the dresser. Morse was standing in front of him. Morse did not have his hands on Billy, nor was Billy yelling or flailing his arms in any way, but Billy was “talking loud.” She could not understand what Billy was saying, and she did not hear Mr. Morse saying anything to Billy because Billy was talking at the time. (T at 145.) She said that she asked Billy “what’s wrong” from about three to five feet away, and then Billy came “over at me . . . swinging his arms and kicking at me.” (T at 147.) When Billy came toward her, she said she put up her arms to block him. In the meantime, Mr. Morse reached over and wrapped Billy’s arms. Morse was standing to the side.
She stated: “[0]ur main concern was keeping him from hurting us.”
She conceded that there were a couple of points throughout the incident when Billy did calm down, and she or Morse would release him. During those times, however, she said there was no opportunity to say “we’re going to call Kenny and you can talk to him” because “as soon as we let go he became combative again.” (T at 157.) At some point Billy’s position changed from facing up — with Morse and Avinger stationed on Billy’s right side — to facing down. Billy “pulled us over,” she said, rolling over onto his stomach several times.
The first time he rolled over, Avinger and Morse were at Billy’s side. “He had gotten loose on the grip and he was pulling trying to hold on to . . . the leg of the bed.” (T at 158.)
When Billy was on his stomach, she saw that he was biting himself and told Morse. As Morse had indicated, he then pulled *303 Billy’s arm out of his mouth. Avinger was not certain if she saw Morse push Billy’s head down, because, she said, “[T]hat’s when Billy was kicking the dresser and the dresser appeared to tip over. The dresser was shaking from his foot. So I had to get a better grip of his feet.” (T at 160.) She only saw him bite himself once. She heard him say: “I want to talk to Kenny,” “I’m going to stop,” and “I’m going to tell Kenny.” (T at 164.) Avinger stated that she never heard Billy gasping for air or give any indication that he was having trouble breathing. She did not see one of his teeth come out.
During later trial testimony, Avinger adjusted her story somewhat, recalling that when she first arrived at the room, Billy was talking loud, Morse was standing in front of him, and nobody’s hands were on anybody. Morse turned to her and said: “Billy attacked me.” Avinger did not observe anything about Billy’s eyes prior to Morse’s administering CPR.
She said she first noticed that Billy had turned blue “when he sat up, when we said he can get up . . .he sat up, he turned around. He lift up like that and I saw that he was blue.” (T at 167.) She stated Billy was conscious, he was not talking, and that she thought there was blood on his mouth.
Avinger later changed her testimony to say that Billy’s back was on the ground and he was facing her, that he lifted himself “halfway sitting up,” and that then “he just laid back” with his eyes open and he was blue. (T at 170.) She did not really know whether he was breathing. We “were saying to him: ‘Billy are you all right? You can get up’, but I couldn’t tell you if I saw his chest go or he took a breath. I don’t know.” (T at 169.)
While Morse performed CPR — or shortly thereafter — Avinger called the 911 operator. The operator told them to perform the Heimlich maneuver on Billy. At some point, Morse took over speaking with the 911 operator because Avinger could not give adequate directions to the group home. Morse performed the Heimlich maneuver on a seemingly unconscious Billy.
Based upon her training, Avinger opined that it was not inadvisable to perform the Heimlich maneuver on an unconscious person. She recalled EMT personnel pointing out that Billy had a red mark on his chest before the EMT workers commenced their efforts, and she assumed that it was from chest compressions. The mark is shown in exhibit D-4.
Avinger also summarized the several different ways she had held on to Billy’s legs throughout the intervention. First, she *304 had been perpendicular to him with her hand on his legs below his knees. Second, she had both his legs under her armpit “when he pulled me over.” Third, she had been on her knees with her hands holding his ankles. Finally, her upper torso had “ended up” across Billy’s lower legs — at the same time Mr. Morse was on top of Billy — she believed. (T at 186.) She thought that Morse was on top of Billy only for “a second.” (Id.) She could not estimate how long the intervention lasted.
Deputy Adam Gonzalez from the Dutchess County Sheriff’s Office testified. He responded to a 911 call saying a person was having a heart attack or possibly having a heart attack at the group home. When he got there, other emergency responders had already arrived, including EMTs, paramedics, fire personnel, and volunteer personnel. He was the first police officer at the scene, and prepared his report based upon interviews with Mr. Morse and Ms. Avinger. (T at 224-225.)
During the course of his investigation, he noted that “usually you do the Heimlich if someone is choking and has something stuck in their throat” (T at 224), not when someone is unconscious. He also noted that Mr. Morse and Ms. Avinger told slightly different stories about the struggle with Billy.
For example, Mr. Morse said that Billy “eased himself down,” and that Billy was not pushed down, whereas Ms. Avinger said they pushed or eased him down slowly. Also, Mr. Morse said that once Billy was on the ground, they positioned him on his stomach, while Ms. Avinger said he was positioned on his left side. Mr. Morse stated that Billy was attempting to bite himself, while Ms. Avinger stated he was attempting to bite himself and the two staff members.
More importantly, in Officer Gonzalez’ view, Mr. Morse never mentioned that Billy “went after” Ms. Avinger in terms of assessing Billy’s attitude and mood. (T at 226-227.) Finally, when speaking with Officer Gonzalez, Ms. Avinger said that when she entered the room Mr. Morse told her that Billy had scratched and assaulted him, whereas Mr. Morse told Officer Gonzalez that he did not say anything to Ms. Avinger. Although Mr. Morse told Gonzalez that Billy was biting himself, he did not “mention anything about pushing his head down.” (T at 228.)
Deputy Gonzalez recalled Ms. Avinger stated that she had noticed Billy’s eyes becoming “blue and fluttery” at one point when they were restraining him, but she did not narrow down when this occurred. Gonzalez’ impression, however, was that there was a “back and forth” between restraints and the *305 releases, and that there was at least one more restraint after Ms. Avinger observed the “flattery” eyes.
Officer Gonzalez filed his report at 10:20 p.m. on September 8, 2001: four hours after the initial call from the group home. (Exhibit 8.) He remembered observing that Mr. Morse was wearing a button down shirt that was still buttoned and “still neat.” Although he was perspiring, Mr. Morse had no visible scratches or bruising. The officer could not recall noticing a nick or scratch on Mr. Morse’s face, although Mr. Morse had told him that Billy had “nicked” him there. Had he seen such a mark, he testified, it would have been written in his report.
Although the matter was further investigated by the Dutchess County Sheriffs Office, the case was closed with the conclusion that the incident was “accidental in nature, [and] requir[ed] no further police involvement.” (Exhibit 8.)
An autopsy of Billy was performed by Michael Baden, M.D., the forensic pathologist for Dutchess County at the time, who testified at some length. Dr. Baden is possessed of considerable expert experience in the field. He indicated that although he does not specialize in forensic odontology — a field that involves bite mark evaluation on the body — he is codirector with such a specialist at the New York State Medical Legal Investigation Unit, and has worked together with such experts in reviewing cases. The autopsy report lists the cause of death as “asphyxia during restraint.” (Exhibit 12.)
Dr. Baden noted two bite marks on Billy’s body, located on the right forearm — not the left arm as had been testified to by Morse and Avinger — as shown in a series of autopsy photographs. (Exhibits D-l, D-2, D-5, D-7, D-9, D-10, D-ll, D-12, D-13, D-14, D-20, D-22, D-23, D-25, D-26, D-27, D-28, D-29, D-30, D-31, D-32, D-33, D-34, D-35.) One bite mark closer to the elbow has a reddish area due to a hemorrhage of small blood vessels caused by a sucking motion — like a “hickey” — he said. (T at 268.) There is another area of hemorrhage near the elbow which is purple and does not have the pattern imprint of a bite mark, and could have been caused by a number of different traumas. He thought the hemorrhage was typical for attempted blood drawing — perhaps ambulance or emergency room personnel attempted to draw blood from a vein in the area — but it could also be due to hand pressure.
Prior to testifying, among other items he reviewed Dr. Baden reviewed the videotape reenactment of the incident by Mr. Morse. He noted that there was no demonstration that any *306 pressure had been applied to decedent’s neck. (T at 270-271.) From his autopsy findings, however, at some point there was a squeezing of the neck sufficient to cause a hemorrhage of about one third of an inch in size, in the soft tissues next to the hyoid bone — a u-shaped bone just above the Adam’s Apple — on the right and left side. Small capillaries were broken in the area of the hemorrhage, within one half of an inch from the carotid arteries: the major blood vessels that go to the brain. He found that the cause of death was asphyxia — inability to breathe— during restraint, based partly upon the evidence of this neck compression. If the squeezing occurred within one or two seconds, and was then released, there would be no asphyxia. If the squeezing was maintained for 20 to 40 seconds, then asphyxia would result.
Other medical observations contributed to his conclusion that the cause of death was asphyxia during restraint. (T at 273.)
Dr. Baden said he had the advantage of having medical records available before he even began the autopsy because Billy died in the same hospital within minutes of the autopsy room. (See exhibit 10.) He saw the medical records indicating that Billy was cyanotic — that the face was blue — when CPR was performed. Cyanosis is caused by a lack of oxygen and is a typical discoloration resulting in persons who die from respiratory arrest. It is atypical for those dying from cardiac arrest. He explained that when people die of a cardiac arrest, “the heart stops and the lungs are still okay, their breathing is okay, they don’t discolor, the face doesn’t.” (T at 274.) When he examined the heart he found it entirely normal for its age, with “very little coronary artery disease, and ... no cardiac abnormality.” (T at 275.) If someone died of a heart attack, cardiac abnormality would be seen.
Shown exhibits C-l through C-19, he indicated that these were microscopic photographs of the histologic sections of the heart muscle, that again show “the heart is perfectly normal for this decedent.” (T at 275.)
Dr. Baden disagreed with the findings made by Dr. Jeffrey Hubbard, defendant’s expert forensic pathologist. Dr. Hubbard had concluded that the cause of death was cardiac arrest due to arrhythmia occurring during restraint. Dr. Baden said that certainly for any death the final death is a cardiac arrest because death is defined by the heart not beating, however here the heart did not stop because of some intrinsic heart disease, it stopped because Billy could not breathe.
*307 Thus while there may be wavy fibers in some ventricular arteries near the heart — a factor Dr. Hubbard found particularly meaningful for his conclusions — Dr. Baden thought them a nonspecific finding. He said: “[0]ne can see wavy fibers for lots of reasons . . . [including] the way the microscopic sections are made in the histology laboratory. From the fact that he was [given] 40 minutes . . . [of] CPU . . . during which time there’s very little oxygen in the heart.” (T at 280.)
Dr. Baden found other insignia, such as “little to no coronary arterial sclerosis,” that suggest that cardiac arrest was not a cause of death. Notably, Dr. Hubbard did not find evidence of asphyxia, whereas the cyanosis credited by Dr. Baden — noted from several sources — was evidence of same. Dr. Baden thought the cyanosis, the hemorrhaging at the neck, descriptions of actions causing compression on both Billy’s neck and his abdomen, the observed bruising, bite marks, and protuberant abdomen — confirmed by the autopsy he performed — exclude any cause of death other than asphyxia. (T at 281.) Dr. Baden pointed out that given Billy’s physical shape, by “placing him on his abdomen, any kind of leaning on him, on his back, any pressure on his back, would have interfered with the ability of his diaphragm to function.” (T at 282.)
He thought that “if all that happened was that one staff held the ankles, the feet, and the other staff held the hands, he would not have died. In my opinion, more was done than that.” (T at 282.) He “[could not] tell” if “the sucking on the bite marks . . . [was] evidence of being unable to breathe,” because he could not tell when the bite marks occurred. (T at 283.) Based upon his experience with the use of physical restraints, Dr. Baden concluded that but for the physical intervention Billy Patrick would be alive. (T at 285.)
On cross-examination Dr. Baden conceded that he first reviewed the slides of samples (see exhibits C-l — C-19) taken from the heart after he had written his autopsy report. (Exhibit 12.) Dr. Baden acknowledged that Billy had a full stomach at the time of his death and that there was close to a pound of food in his stomach. (Exhibit D-8.)
Dr. Baden would not agree that the hemorrhage marks by Billy’s neck could have been caused by resuscitation efforts. He explained that to intubate is to insert a tube through the mouth and into the trachea or windpipe to provide oxygen into the air passages. EMTs normally pull the head backward and slip the tube into the air passages through the mouth. (T at 294.) Dr. *308 Baden said the seven millimeter fresh hemorrhage could not have been produced unless somebody grabbed his neck. He said he had never seen “hemorrhages around the hyoid bones in people who are intubated no matter what technique they use.” He said the mark was not related to the cricoid — which is below the Adam’s apple — but to the hyoid: approximately two inches above the Adam’s apple. The hyoid bone is also above the larynx. He would not say that pressure on the larynx could occur during intubation, and repeated that “one does not get hemorrhages about the hyoid bone no matter how they try to manipulate the tube going down.” (T at 296.)
He said it was not usual to see cyanosis in the face with a death from heart disease, but conceded that “if a person goes into congestive heart failure so the heart is failing as a pump, that takes time, then one can get cyanotic because the heart’s failure as a pump interferes with breathing ... It does not happen suddenly.” (T at 296-297.)
Dr. Baden acknowledged that cyanosis can be seen when death is caused by seizures and asthma, if the person cannot breathe.
On redirect examination Dr. Baden confirmed that his review of the histopathologic slides after he completed his autopsy report did not cause him to change his opinion as to the cause of death, and he confirmed that he would have an obligation as a medical examiner to alter his conclusion had he seen something to change his opinion. Additionally, Dr. Baden stated that the forensic toxicology report he reviewed “some months later” than his autopsy showed only that Billy was taking his prescribed medications — in terms of those drugs that could be tested for in the system — and had no alcohol or unprescribed drugs in his system. (Exhibit 17; T at 299-301.)
What drugs were found in Billy’s system: Benadryl, often used to make a person sleepy, and two psychotropic drugs, Clomipramine and Tegretol, would not have any effect on decedent’s heart.
Victor Feit, D.D.S., a forensic odontologist for Dutchess County since 1976, as well as a forensic odontologist currently working with the State Police in Dutchess, Orange and Ulster counties, testified about his training and work in identifying bite marks and identifying victims through dentition. Dr. Baden, with whom he had worked in the past, called him in September 2001 for consultation concerning the bite marks found on Billy Patrick’s right arm. He reviewed the bite marks on Billy’s arm, examined Billy’s teeth and took dental impres *309 sions as part of the autopsy process on September 8, 2001, and concluded that the bite marks were self-inflicted. The impressions were also sent to the New York State Police laboratory for computer analysis to confirm his diagnosis. Although he never heard whether his diagnosis was confirmed by such analysis, he never heard that his diagnosis was refuted.
Dr. Feit stated that the bite mark on the right forearm is shown in exhibit D-14 and a closeup of the mark is shown in exhibit D-13. Exhibit D-ll shows a bite mark in comparison to Billy Patrick’s teeth — or dentition — and the impression of Billy’s teeth the witness had taken. (T at 334.)
Noting that there are well over 600 types of bite marks recognized, the bite marks shown in the photographs he selected — and the only bite marks found on the decedent’s body — were each made by decedent and have a different genesis. The bite mark that is closer to the elbow of the right forearm is wider and more red in color, and contains a sucking area in the middle, was placed there by decedent by his sucking on his arm, creating a hickey. (See exhibit D-14.) Dr. Feit thought that this bite mark was made with the arm being pulled into the mouth, creating a holding bite that lasted more than five seconds. The other bite mark, closer to the wrist, and less red, was made with severe force, and on an angle. (Id.) This was a forceful bite, lasting perhaps one to two seconds, and more painful.
Dr. Feit opined that the orientation of the deceased’s arm at the time of the sucking bite shown on exhibits D-ll and D-14 was with the elbow up, the wrist down and, given the fact that both top and bottom teeth were engaged, it is more of a “held bite.” (T at 341.) Because the teeth are very “pronounced” in the bite, “there’s no sign of the mouth being sliced or moved back and forth. It’s being rigid . . . [the person’s head was not moving independent of the person’s arm because] the bite mark was straight in. It was not being pulled or ripped.” (Id.) He could not say whether the two bite marks were made at the same time, and he thought that given the location of the marks — on the dorsal side of the forearm — the elbow would need to be turned away and slightly raised rather than flat on the floor with the palms down. (T at 343-344.)
During cross-examination, Dr. Feit confirmed that a violent struggle would create a different type of bite — the skin would be pulled to the side either way because of trying to move the arm. There were no sideways tears. It is a “straight-in bite *310 where the bite is held in one position. So either the head and arm has to be held in one position, or the head has to be.” (T at 347.) He agreed that the bite mark showing the quick bite he described could be consistent with a violent struggle.
On redirect examination Dr. Feit opined that a bruise on the forearm, together with the bite marks, and the reenactment on the videotape, further supports his view that the arm was being held in position against the deceased’s mouth.
On re-cross-examination he conceded that the bruise on the forearm could also have been created by the EMTs or the doctors or nurses in the ER trying to put IV tubes into him. (T at 349.)
William Corbin testified as claimants’ expert in the area of SCIP and SCIP-R techniques training and in CPR professional rescuer standard first aid training. Mr. Corbin had a 30-year career with the State of New York in the OMRDD agency at Hudson Valley DDSO, formerly known as Letchworth Village Developmental Center, and is currently the cofounder and vice president of a varied service for individuals with special needs, called Footings, Incorporated.
One of his main responsibilities during his work at the DDSO — which encompassed Westchester, Rockland, Orange and Sullivan counties — was as master trainer in SCIP-R techniques. Not only did he conduct and monitor classes at the DDSO in state-run facilities, but also at voluntary agencies such as the Association for Retarded Citizens overseen by the State. He was certified as a master trainer in SCIP in 1984, and remains so qualified in SCIP-R. To this day, he continues to conduct SCIP-R training courses for voluntary agencies and school districts.
Mr. Corbin explained that there is a manual containing the curriculum that is used to train instructors and others in SCIP-R. (Exhibit 18.) The curriculum — to which he contributed — went through a period of revisions, with the final revisions in place by 1998. He himself is depicted in photographs demonstrating physical interventions — or “personal interventions” as they are called — in the manual. The manual contains the New York State OMRDD regulations for training developmental aides in SCIP-R techniques. (Exhibit 18.)
The training course lasts for at least two full days and presents a strategy for dealing with consumers. It particularly emphasizes avoiding and preventing physical confrontations. Indeed, most of the manual is devoted to how to avoid a personal *311 intervention by using other techniques. There are six units in the curriculum, moving from self-awareness — wherein the staff member examines his own attitudes toward handling people who may be upset — to successive levels of intervention with consumers.
From proactive interventions premised upon staff members knowing the individual consumers in their care and knowing the kind of environment necessary to keep a secure, calm environment for these consumers, to active interventions, there are specific guidelines to be followed in the training.
The guidelines developed over time by OMRDD also include an abuse policy, whereby a definition of abuse is provided and the developmental aides are made aware of its prohibitions. The regulation gives a definition of abuse, as
“[t]he maltreatment or mishandling of a person receiving services which would endanger the physical or emotional well-being of the person through the action or inaction on the part of anyone, including an employee, intern, volunteer, consultant, contractor, visitor, or others, whether or not the person is or appears to be injured or harmed. The failure to exercise one’s duty to intercede in behalf of a person receiving services also constitutes abuse.” (14 NYCRR 624.4 [c].)
Specific examples of abuse are also codified, including physical or psychological abuse, or other types of unauthorized actions such as using mechanical restraints without medical approval, or locking an individual in a closet or a room. (See id.)
In terms of personal interventions, Mr. Corbin indicated that there are requirements for certification after attending the SCIP course that allow an individual to be certified in one-year increments to use such a method of interaction with consumers. The guidelines suggest annual recertification, including a requirement that the student take an additional course of between six and eight hours to obtain it. With respect to the initial certification, the individual must attend the course, participating in the classroom including the physical interventions demonstrated; there is a written test and a “return demonstration” whereby the student practices the physical technique until the instructor is satisfied that the student can independently perform the techniques required.
When a person receives a certificate in SCIP-R the certificate represents that they have at least performed the core tech *312 ñiques — the first category of personal intervention— satisfactorily. The other two categories of personal intervention are specialized techniques and restrictive techniques.
The core techniques deal with teaching a person to defend himself from attack, and includes a few holds such as a “standing wrap up,” and an “escort,” which refers to moving a person from one place to another safely. These are all standing or sitting techniques. No core techniques are executed with a staff person on the ground. After verbal intervention has been exhausted the core techniques in the “holding” subcategory, noted progressively, are touch, a one person escort, a seated variation of a one person escort, arm control, and a standing wrap up. (Exhibit 18.)
Throughout all the categories of personal intervention techniques, there are what are known as “stop points,” where the staff person has stabilized the situation and allows the consumer an opportunity to let go or end the situation before initiating any other physical intervention.
Other than the SCIP-R core techniques — which are required for a developmental aide’s minimum certification — the specialized and restrictive techniques are taught as suggested by the manual on an as needed basis depending on the composition of the particular group home. (T at 397.) Separate certification in those techniques is required.
Mr. Corbin reviewed the depositions of Raymond Morse and Shelia Avinger, Billy Patrick’s medical records, his death certificate, the emergency room documents, the autopsy report and the videotaped reenactment by Mr. Morse, prior to formulating his opinion concerning the circumstances surrounding Billy’s death.
Reviewing the reenactment by Mr. Morse preserved on videotape, Mr. Corbin found that Mr. Morse did many things appropriately. Indeed, the SCIP-R techniques contemplate that the aide will exercise judgment and the techniques are a tool to be applied in the exercise of good judgment. Notably, the goal is to have the consumer able to exercise control over himself. The techniques used by the aide should move toward that goal— with the aide providing control when the consumer is out of control — but there is no requirement in the curriculum that “once you start a physical technique, you must carry it through and do it until the person is . . . totally submissive” (T at 411).
A critical “stop point” or opportunity to back off, not taken by Mr. Morse or Ms. Avinger, occurred after Mr. Morse first ap *313 plied a standing wrap up — and Billy was then on the floor while Mr. Morse was standing up, as was Ms. Avinger having just walked into the room. (T at 411.) Musing as to what would warrant the staff members going down on the floor with Billy, Mr. Corbin said the aides should ask themselves: .
“Is this a truly dangerous situation? Is this not a stop point where the staff members can back off and give Mr. Patrick an opportunity to have a temper tantrum. Is harm coming to him? The testimony I reviewed says he’s kicking the dresser, he kicks at Ms. Avinger, hitting the bedposts with his arms. I see the result of that could possibly be bruises, could possibly be ... a scratch . . . these are not serious injuries that could come from this type of temper tantrum. What is he doing that would warrant staff to get down on the floor and wrestle with him on the floor? I believe that this is an example where staff could have exercised better judgment. I think this is an overreaction in this situation” (T at 412).
Mr. Corbin explained that if the intention was to restrain Billy on the ground, the proper technique would be to maintain the standing wrap up, go down with the consumer on your knees, and then go to a side lying wrap as set forth in the manual. Instead, Mr. Morse let go of Billy’s hands, allowed him to go down to the floor by himself, and then regrasped his hands. “If you’re going to let go and step back and give Mr. Patrick a chance to control himself, to collect himself, then, yes, letting go is perfect. But letting go and then going down to grab him is not the way to do it.” (T at 414.)
Mr. Corbin observed from the demonstration, a succession of missteps on the part of Mr. Morse and Ms. Avinger. For example, after Billy was on the ground, it appeared that Mr. Morse was attempting a side lying wrap up, where the hands should cross the front of Mr. Patrick and move down to his hips to be firmly held on his side. This position prevents the hips from turning over. What Mr. Morse did was have his hand under his arms on top of Billy’s forearms: not a SCIP technique, nor would it become a SCIP technique because it does not allow the leverage you need to prevent the consumer from rolling the aide and/or rolling onto his stomach. Additionally, this way the hands are too close to the consumer’s mouth, which is a dangerous location if the consumer is struggling.
As the reenactment progressed, Mr. Corbin noted that Mr. Morse’s positioning, without weight distributed through his *314 knees, inevitably placed more weight on top of Billy. An important SCIP precept is that the aide’s weight should never be on top of the consumer. Moreover, a lying wrap up — kind of a standing wrap up on the ground — involving the consumer laying face down on top of their arms with the staff person on top is not an approved technique and has been taken out of the curriculum since 1998. In recertification classes the point is brought up strongly.
Indeed, the lying wrap up was removed after OMRDD did a statewide review of the technique and found that it was too dangerous, and had, in numerous cases, been a factor in contributing to the death of a consumer.
Other aspects of the reenactment that Mr. Corbin found disturbing were the apparent lack of recognition of additional opportunities to allow Billy to calm himself and the failure to recognize possible signs of distress totally unrelated to whatever initially had triggered any lack of control on the consumer’s part. Indeed, excessive struggling, he noted, might mean that the consumer is struggling for his safety somehow because, for example, they are in pain or cannot breathe. Mr. Corbin found inexplicable the movement described and demonstrated by Mr. Morse whereby he pressed down on Billy’s head at the same time that he pushed Billy’s arm in. This forced the teeth down onto the arm at the same time that Mr. Morse was pulling the hand, and further obscured opportunities to monitor Billy’s ability to breathe. Finally, Mr. Corbin found it highly unlikely that Billy collapsed but continued to speak, given the physical positions Mr. Morse said were maintained.
Observing the reenactment of how Mr. Morse stated he performed CPR on Billy, Mr. Corbin noted that Mr. Morse did not use either of two techniques that would have been less dangerous to Billy. To do effective chest compressions and CPR, he said, “[Y]ou must position yourself on the side of the victim on your knees.” (T at 430.) Notably, in the reenactment — attested to at trial as the most accurate statement of events by Morse — Mr. Morse did not place any weight on his knees but rather remained standing. In order to exert the proper pressure you need to be kneeling next to the victim. -
In the alternative, one could lift the victim up and put him on a table or a gurney to perform CPR compressions from a non-kneeling position, but simply standing is not only not effective but also dangerous.
From Mr. Corbin’s understanding of the information presented, Billy stopped breathing while being restrained, and then *315 did not receive adequate resuscitation. Since Ms. Avinger was making the telephone call to the 911 operator, only the individual who admittedly had difficulty with his knees was available to immediately administer CPR compressions or rescue breaths. When Mr. Morse took over the telephone call to give directions since Ms. Avinger was less familiar with the group home’s location, some minutes had passed. It only takes approximately four minutes for brain damage to occur, Mr. Corbin said.
Mr. Corbin said that initially, if Billy was sitting quietly in his room looking out the window before staff entered, and then jumped up and attacked once staff entered the room, he wonders what precipitated such a reaction; if there “might have been an antecedent to that behavior.” He noted that Mr. Morse’s attempts at verbal calming were essentially three phrases: what’s wrong, calm down, and relax. Indeed, “calm down,” according to Mr. Morse’s reenactment, is used approximately 10 times. Mr. Corbin opined that if the consumer is encouraged — assuming a problem in the first instance — to “calm down” in the beginning, that may be appropriate. But without anything further actually addressing the consumer’s responses, such as, for example, Billy’s repeated requests to speak with Kenny, the situation spirals.
Rather than distracting the consumer, or engaging his attention toward something more positive by saying, for example, “Kenny is not here right now, but I do know when he will be. There’s a schedule downstairs, let’s go look and see when you can talk to Kenny.” Another approach to responding to Billy’s saying “I want to talk to Kenny right now” might be “pull[ing] something out of the blue. For example, ‘Oh, Kenny, I know him, he’s a good guy, yeah. Oh, Kenny and I go back a long way.’ Just for the staff to start talking about something that the consumer is going to engage with.” (T at 438.) These are distraction techniques listed in the training guidelines.
Another point he saw where verbal intervention might have worked more successfully was the stop point where Billy was on the floor kicking and hitting and the staff were standing. Rather than move away from him when he was kicking, to observe what his reaction might be to stepping back, Ms. Avinger moved forward. Mr. Corbin likened this to a training tape that he uses where the consumer is shown shaking a finger at staff. The point is made in the training that you do not react by taking a consumer down when she is merely shaking a finger at you. The techniques are used only for truly dangerous situations: *316 someone is going to jump through a window; someone is going to run out in the road. Then it would be appropriate to use a standing wrap up, or a takedown, if necessary. (T at 440.)
Mr. Corbin opined that based upon the scenarios presented by the aides’ different versions of what happened — and upon the one consistent fact in their tales — at the very latest, Billy Patrick should have been released from restraint when he rolled over onto his stomach. He opined that if Mr. Morse said to Ms. Avinger when she walked into the room that “Billy just attacked me” — a statement she indicates Mr. Morse made in her own statement to the Dutchess County Sheriffs Office — such “rehashing” in front of the consumer is an ill-advised escalator of the situation.
It was his opinion that staff inappropriately initiated a restrictive physical intervention when Billy was on the floor kicking, and they chose to initiate a hold on him. Additionally, they failed to properly monitor him once restrictive physical intervention began especially in light of the fact that he had eaten recently. Indeed, the manual prescribes that if a consumer has eaten recently, staff are to be especially cautious about initiating a restrictive personal intervention because of the risk of death due to aspiration. (T at 469; exhibit 18.) Mr. Corbin stated that throughout the period between Billy Patrick “going to the floor” until the time he was turned over and observed to be blue, neither Mr. Morse nor Ms. Avinger was in a position to adequately monitor the well-being of Billy Patrick. Finally, having failed to place themselves in the appropriate position to monitor his well-being, observable signs of respiratory distress were unremarked.
More than two years after their son died, the claimants received a copy of a letter dated November 7, 2003, in redacted form, giving the conclusions of the State of New York Commission on Quality of Care after the investigation concerning the circumstances of Billy Patrick’s death. (Exhibit 5; see also exhibit 14.) Concluding that the staff was properly trained in restraint techniques and did not intentionally harm Billy Patrick, they nonetheless concurred with the cause of death listed on the autopsy report as asphyxia during restraint, and found that the circumstances of the death suggested deficiencies in the care provided. (Exhibit 5.) They also noted that the event wherein decedent required cardio-pulmonary resuscitation following a restraint in March 1999 should have been part of his records, and should have triggered his medical evaluation before any subsequent use of physical interventions. (Id.)
*317 Records from Sharon Hospital confirm that on March 10, 1999 Billy Patrick was admitted at the emergency room with complaints of “aspiration with choking spell” and “period of unresponsiveness,” and discharged on March 11, 1999 to the Verbank Group Home. (Exhibit 9.) In a narrative portion of the hospital record, the physician writes:
“The patient is a 33-year-old male, Taconic DDSO outpatient in a community home, had an episode of aspiration. He was choking, became unresponsive, turned blue. Home caretaker tried to clear his airway and then began mouth to mouth CPR. After several minutes he said the patient began to gag, he rolled him on his side, cleared his airway, and he began breathing spontaneously. The patient by the time the paramedics arrived was awake, he had diaphoretic skin, was breathing irregularly, and they applied oxygen and transported him to the emergency department . . . The patient’s past medical history is remarkable for seizure disorder” (ibid.).
In a handwritten nursing record from his admission that day, the following is indicated: “First responder here — states . . . [patient] came home from work was agitated & combative they ‘took him down’ to the ground . . . [patient] seemed to aspirate & choke — CPR started” (ibid.).
A memorandum setting forth treatment guidelines dated April 27, 2000, modifies the use of SCIP techniques for ill or injured individuals, and requires reevaluation of their use on ill or injured individuals, if such procedures might cause them to suffer increased risk. (Exhibit 15.) Neither Morse nor Avinger was aware of this policy.
Robert Bailey, currently the assistant director of staff development and training for the OMRDD, and an employee of the agency for 33 years, was called by the State as its first witness. He had been the primary editor of the material in the SCIP-R training manual as well as the earlier incarnation, has extensive hands-on training experience as well, and had used Mr. Corbin as one of the individuals contributing material to the revisions in the 1998 edition.
After hearing the testimony of Shelia Avinger and Raymond Morse, as well as all the other testimony in the case, it was his opinion that Ms. Avinger and Mr. Morse acted appropriately to protect Billy Patrick, themselves and the other consumers in the house. For example, had they not entered into Billy’s room *318 after reports from the other consumer of a problem, staff might have been seen to have failed to intervene under the definitions cited as “abuse” of resident consumers. (T at 480.)
In large part, Mr. Bailey affirmed the testimony of Mr. Corbin best described as related to standard of care. His testimony also confirmed Mr. Corbin’s point that staff training in these techniques always emphasizes the need to use the least amount of force possible in the least restrictive fashion, and to allow release of the consumer, whenever possible. Indeed, Mr. Bailey agreed that “when a consumer is in a prone position ... we tell folks not to be on top of them, not to put any weight on top of them.” (T at 487.) But he also said that in this case this appeared to be a quick struggle and it appeared that the aides “acted as they felt they should have” in the situation given the quick judgment calls they had to make. He opined that were they to have allowed Mr. Patrick to lay on the floor flailing his arms and kicking there might be “a risk” for abuse there, too.
On cross-examination Mr. Bailey conceded several points where different judgments could have been made. He agreed that it might be appropriate to knock first before entering a consumer’s room when a consumer is, as far as can be observed, merely sitting on his bed looking out the window. He agreed that an inquiry such as “what’s wrong” might “serve as an antecedent to some behavior that would be undesirable.” (T at 498.) Mr. Bailey also agreed that it might have been prudent to inquire further of Donald — the other party supposedly involved in the unspecified problem — about what happened.
Mr. Bailey did not know whether Mr. Morse was certified in SCIP-R or additionally certified in the use of restrictive intervention. Mr. Bailey agreed with Mr. Corbin that the use of the lying wrap up was removed from the SCIP-R guidelines, and agreed that as demonstrated on the videotape reenactment by Mr. Morse, placing Billy Patrick on his stomach with his hands under him and drawn up, and with Mr. Morse’s full weight on him, is not an approved SCIP-R technique. (T at 499.) Mr. Bailey also ultimately agreed that if an individual collapsed to the floor and was engaged in screaming and yelling and carrying on it would be more acceptable — if the alternative were available — to simply move things out of the way and let the person have his tantrum. Specifically, he agreed that if Ms. Avinger were being kicked at, the least intrusive method of preventing injury to herself would be to step back, rather than wrapping Billy’s legs. He agreed that the technique demonstrated by Mr. Morse on *319 the videotape reenactment was in the restrictive category, to be employed only when serious severe personal injury to the consumer would result upon a failure to employ the technique.
Somewhat overstating the point, Bailey also said: “[I]f we can guarantee that . . . [Billy’s] not going to injure himself” it would be more appropriate for Mr. Morse to step back while he was still standing and Billy was on the floor kicking and flailing.
Jeffrey Hubbard, M.D., defendant’s expert forensic pathologist, who is currently a clinical professor of pathology at Albany Medical College, and an adjunct professor of law at Albany Law School, disagreed with Dr. Baden’s conclusions concerning the cause of Billy Patrick’s death. Although he did not examine the body, he reviewed the glass microscopic slides prepared by the autopsy pathologist — and created the series of photographs numbered exhibits C-l through C-19 showing portions of the heart, as well as several enlarged versions of portions of the slides (exhibits C-7-A, C-14-A, C-16-A). He reviewed the other photographs taken (exhibits D-l — D-35), transcripts of testimony, and was present for Dr. Baden’s testimony. He did not review the videotape reenactment of Mr. Morse’s actions on September 8, 2001 prior to testifying.
It was his opinion that William Patrick “had a dying heart with actual dead muscle fibers at the time he was taken ill and died.” (Volume V T at 284.)[5] This dying heart, he said, is shown by the wavy fibers present. Where portions of the heart muscle are no longer viable there will be wavy fibers that exist for some time before the person dies. He also thought that having a full stomach of food — as did Billy Patrick — affects “one’s chances of having some sort of cardiac arrhythmia.” (Volume V T at 284-285.) He disagreed with Dr. Baden’s view that cyanosis had to have been caused by an inability to breathe, saying “anything that causes lack of oxygen getting to the blood, whether it’s due to a lung problem, or an airway problem, or a heart pumping problem, can have cyanosis.” (Volume V T at 287.) Rather than either an obstructional or mechanical asphyxia causing his death, Dr. Hubbard opined that Billy Patrick died of a cardiac arrhythmia occurring during a struggle. With regard to mechanical asphyxia, he said there would have to be some evidence of severe compression of the chest, like bruises or fractured ribs. He said he saw none.
*320 On cross-examination, Dr. Hubbard would not agree that the presence of the wavy fibers in the heart could have been caused by CPR performed for more than 40 minutes with very little oxygen in the heart as opined by Dr. Baden, but did agree that wavy fibers could be caused by cocaine and myocarditis as noted by Dr. Baden, not applicable in Billy Patrick’s case in any event. He also agreed that the vast majority of the sample of the heart did not have wavy fibers. He conceded that the abrasion mark on Billy’s chest shown in several of the autopsy photographs could be evidence of compression, and could not say whether it was made before or after the cardiac arrest he asserted as the cause of death. He also agreed that a mechanical asphyxia could result if a person, like Billy Patrick, “had a big stomach and a big meal and they’re face down on the floor and someone heavier lays on top of them.” (Volume V T at 306.)
After viewing the videotape reenactment for the first time at trial, Dr. Hubbard agreed that it appeared that a chest compression could have occurred and that Billy’s breathing from his nose could have been obstructed by his own arm or a staff member’s arm. He also conceded that Dr. Baden was more experienced than he is.
Discussion and Conclusion
To establish negligence the following elements must exist: (1) that defendant owed the claimant a duty of care; (2) that defendant failed to exercise proper care in the performance of that duty; (3) that the breach of the duty was a proximate cause of claimant’s injury; and (4) that such injury was foreseeable under the circumstances by a person of ordinary prudence. Claimants must establish by a preponderance of the credible evidence that defendant’s negligence caused decedent’s death. Based on the foregoing, the court determines that claimants herein have carried this burden.
This claim presents the nightmare suffered by any parent of a disabled child forced to entrust that child to the care of others. Having entrusted one’s child to the care of others, one hopes that those entrusted do their utmost to earn and retain that trust. Unfortunately, through a series of negligent omissions and acts, the State betrayed that faith.
It was negligence to fail to record the prior incident in March 1999 when Billy Patrick needed resuscitation — and “turned blue” — after aides “took him down” (see exhibit 9) at the group home, so that the developmental aides would be adequately *321 informed about the specific health needs of a consumer under their care, and avoid harmful physical intervention. It was negligence to fail to adequately train aides working at the group home in the techniques necessary — including specialized and restrictive techniques — in conformance with the specific needs of the Verbank Group Home population, including decedent. Faced with an unremarkable report by one of the consumers in their care that there was “a problem” between one consumer and another, at every turn the aides appear to have overreacted and escalated matters. Even if the steps taken prior to positioning Billy — by force — on the floor on his protuberant stomach were reasonable ones, thereafter neither aide properly maintained a lookout for his well-being and did exactly what any training they did receive told them not to. Force was used on Billy until he submitted to their will. That submission was his death.
While the defendant attempts to characterize the errors made by staff in their treatment of Billy Patrick on the evening of September 8, 2001 as mere errors in judgment, this evades the real point of this claim. To make reasoned judgments worthy of deference, those exercising that judgment should be adequately informed, trained and able. While the developmental aides here were clearly troubled by what transpired, and the court does not find that they intended to cause Billy’s death, they were ill-equipped to deal with the events as they unfolded.
On another somewhat perplexing tack, the defendant mounted a defense based upon a theory that rather than being asphyxiated, Billy died of cardiac arrhythmia. Notably, the triggering mechanism for both causes of death was the physical restraint in the first place. The salient point is that but for the use of excessive force through an overreaching physical intervention, Billy would likely be alive today.
Accordingly, the court finds the State fully liable for Billy’s pain and suffering and death. The clerk of the court is directed to enter an interlocutory judgment in favor of claimants and against the defendant, State of New York.

. Formerly known as Shelia Burse.

. SCIP-R stands for strategies for crisis intervention and prevention-revised. Morse described the SCIP techniques as restraint procedures used to keep consumers safe from hurting themselves or others.

. References to pages in the trial transcript are denoted by T.

. Volume V of the transcript testimony was not numbered consecutively after volume W but includes all of the testimony by Dr. Hubbard.