OPINION OF THE COURT
Alexander, J.
We are presented on this appeal with the issue of whether and under what circumstances the State may forcibly admin *490 ister antipsychotic drugs[1] to a mentally ill patient who has been involuntarily confined to a State facility.
I
When this litigation commenced, appellants Mark Rivers, Florence Zatz and Florence Grassi were patients at the Harlem Valley Psychiatric Center. Each was being retained pursuant to orders of the Dutchess County Court which had found them to be persons "in need of involuntary care and treatment” in that they have a "mental illness for which care and treatment as a patient in a hospital is essential to [their] welfare and [their] judgment is so impaired that [they are] unable to understand the need for such care and treatment” (Mental Hygiene Law § 9.01).
Mark Rivers was involuntarily committed pursuant to Mental Hygiene Law § 9.27 on or about March 20, 1984 and was retained by court order entered on June 13, 1984. Prior to the entry of this order, Rivers refused to be medicated with antipsychotic drugs, and the administrative review procedures prescribed by the regulations of the Commissioner of Mental Health (14 NYCRR 27.8) were implemented.[2] His objections *491 were overruled and he was thereafter medicated with various antipsychotic drugs, including Prolixin Hydrochloride, Prolixin Decanoate and Mellaril. Florence Zatz was also involuntarily committed pursuant to Mental Hygiene Law § 9.27 and was retained by court order entered on June 25, 1984. On April 20, 1984, shortly after her involuntary admission but prior to the retention order, she refused to be medicated with antipsychotic drugs but her refusal was similarly overruled following administrative review. She was medicated with Navene and Lithium.
Rivers and Zatz thereafter commenced this declaratory judgment action against the Commissioner and officials of the Harlem Valley Psychiatric Center to enjoin the nonconsensual administration of antipsychotic drugs and to obtain a declaration of their common-law and constitutional right to refuse medication. Special Term denied a request for class certification because plaintiffs had failed to show "the benefit of class action status to outweigh the distinct differences that must be addressed in each instance as well as the benefit of stare decisis for guidance in future cases.” Upon defendant’s motion for summary judgment, the complaint was dismissed. Special Term reasoned that the involuntary retention orders necessarily determined that these patients were so impaired by their *492 mental illness that they were unable to competently make a choice in respect to their treatment.
Florence Grassi was involuntarily committed to Harlem Valley on August 2, 1984 and subsequently retained pursuant to a court order entered on September 24, 1984. She refused treatment with antipsychotic drugs, but was thereafter forcibly medicated with Prolixin Hydrochloride following completion of the administrative review process in which her protest was overruled. She commenced an article 78 proceeding, alleging that the forcible use of antipsychotic medication violated her common-law and constitutional right to determine her own course of treatment.[3] Her application for preliminary injunctive relief was denied after a hearing, and the proceeding was dismissed upon respondents’ cross motion for the same reasons expressed by the court in dismissing the Rivers/ Zatz complaint.
The Appellate Division consolidated appeals by Rivers, Zatz and Grassi from the respective Special Term order and judgments, and affirmed for reasons stated at Special Term (112 AD2d 926). We now reverse and hold that the due process clause of the New York State Constitution (art I, § 6) affords involuntarily committed mental patients a fundamental right to refuse antipsychotic medication.
II-A
It is a firmly established principle of the common law of New York that every individual "of adult years and sound mind has a right to determine what shall be done with his own body” (Schloendorff v Society of N Y. Hosp., 211 NY 125, 129 [Cardozo, J.]) and to control the course of his medical treatment (see, Matter of Storar, 52 NY2d 363; Schloendorff v Society of N. Y. Hosp., 211 NY 125, supra). This tenet has been faithfully adhered to by our courts (see, Matter of Storar, 52 NY2d 363, supra; Matter of Harry M., 96 AD2d 201, 207; see generally, People v Eulo, 63 NY2d 341, 357; Hanes v Ambrose, 80 AD2d 963; Matter of Saunders v State of New York, 129 Misc 2d 45, 50; Matter of Winthrop Univ. Hosp. v *493 Hess, 128 Misc 2d 804; Matter of Erickson v Dilgard, 44 Misc 2d 27 [Meyer, J.]), and recognized by our Legislature (Public Health Law §§ 2504, 2805-d; CPLR 4401-a; 10 NYCRR 405.25 [a] [7]).
In Storar, we recognized that a patient’s right to determine the course of his medical treatment was paramount to what might otherwise be the doctor’s obligation to provide medical care, and that the right of a competent adult to refuse medical treatment must be honored, even though the recommended treatment may be beneficial or even necessary to preserve the patient’s life (52 NY2d, at p 377, supra). This fundamental common-law right is coextensive with the patient’s liberty interest protected by the due process clause of our State Constitution (cf. Cooper v Morin, 49 NY2d 69, 80).
In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires (see, Matter of Erickson v Dilgard, 44 Misc 2d 27, 28, supra; see generally, Olmstead v United States, 277 US 438, 478 [Brandeis, J., dissenting]; Union Pac. Ry. Co. v Botsford, 141 US 250, 251; Davis v Hubbard, 506 F Supp 915, 930-933; Pratt v Davis, 118 Ill App 161, 166, affd 224 Ill 300, 79 NE 562). This right extends equally to mentally ill persons who are not to be treated as persons of lesser status or dignity because of their illness (Superintendent of Belchertown State School v Saikewicz, 373 Mass 728, 370 NE2d 417). As noted by the Supreme Court of Oklahoma, "[i]f the law recognizes the right of an individual to make decisions about * * * life out of respect for the dignity and autonomy of the individual, that interest is no less significant when the individual is mentally or physically ill” (Matter of K. K. B., 609 P2d 747, 752).
In delineating their interest in medicating certain patients over their objections, respondents do not dispute the right of competent adults to control the course of their treatment and to refuse antipsychotic medication, but argue that an involuntarily committed mental patient is presumptively incompetent to exercise this right since in ordering involuntary retention, the court has implicitly determined that the patient’s illness has so impaired his judgment as to render him incapable of making decisions regarding treatment and care. We conclude *494 however, that neither the fact that appellants are mentally ill nor that they have been involuntarily committed, without more, constitutes a sufficient basis to conclude that they lack the mental capacity to comprehend the consequences of their decision to refuse medication that poses a significant risk to their physical well-being. Indeed, it is well accepted that mental illness often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently, that many mentally ill persons retain the capacity to function in a competent manner (see, Brooks, Constitutional Right to Refuse Antipsychotic Medications, 8 Bull of Am Academy of Psychiatry & L 179, 191 [hereafter cited as Constitutional Right]; Rogers v Okin, 478 F Supp 1342, 1361). Nor does the fact of mental illness result in the forfeiture of a person’s civil rights (see, Mental Hygiene Law § 33.01), including the fundamental right to make decisions concerning one’s own body (see, Du Bose, Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment, 60 Minn L Rev 1149, 1160).
Although the historic view of many courts and psychiatrists was that a commitment decision necessarily includes a determination of incompetency (see, Plotkin, Limiting the Therapeutic Orgy: Mental Patients’ Right to Refuse Treatment, 72 NW U L Rev 461, 474-479 [hereafter cited as Therapeutic Orgy]), the nearly unanimous modern trend in the courts,[4] and among psychiatric and legal commentators[5] is to recognize that there is no significant relationship between the need for *495 hospitalization of mentally ill patients and their ability to make treatment decisions. Indeed, there is considerable authority within the psychiatric community that from a medical point of view no relationship necessarily exists between the need for commitment and the capacity to make treatment decisions (see, Therapeutic Orgy, op. cit., at 489, citing Davidson, Forensic Psychiatry, at 196) since the presence of mental illness does not ipso facto warrant a finding of incompetency. Professor Brooks points out that "there is ample evidence that many patients, despite their mental illness are capable of making rational and knowledgeable decisions about medications. The fact that a mental patient may disagree with the psychiatrist’s judgment about the benefit of medication outweighing the cost does not make the patient’s decision incompetent” (Constitutional Right, op. cit., 8 Bull of Am Academy of Psychiatry & L, at 191).
II-B
We reject any argument that the mere fact that appellants are mentally ill reduces in any manner their fundamental liberty interest to reject antipsychotic medication. We likewise reject any argument that involuntarily committed patients lose their liberty interest in avoiding the unwanted administration of antipsychotic medication. We recognize, however, that the right to reject treatment with antipsychotic medication is not absolute and under certain circumstances may have to yield to compelling State interests (Matter of Storar, 52 NY2d 363, 377, supra; see, Matter of Eichner, 73 AD2d 431, mod 52 NY2d 363; see, e.g., People v Onofre, 51 NY2d 476). Where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution, the State may be warranted, in the exercise of its police power, in administering antipsychotic medication over the patient’s objections[6] (Addington v Texas, 441 US 418, 426; see, Davis v Hubbard, 506 F Supp 915, 934-935, supra; People v Medina, *496 705 P2d 961, 971 [Col]; Matter of K. K. B., 609 P2d 747, 751 [Okla], supra; Gundy v Pauley, 619 SW2d 730, 731 [Ky] [electroshock therapy]; Note, Common Law Remedy, op. cit., 82 Colum L Rev, at 1738-1743). The most obvious example of this is an emergency situation, such as when there is imminent danger to a patient or others in the immediate vicinity (see, 14 NYCRR 27.8 [b]). Under these circumstances, the State’s police power would justify forced medication, albeit temporarily — continuing only as long as the emergency persists. In all cases, however, in order to override the patient’s right to control his care and treatment, the State’s interest must be compelling.
Here, no claim is made that antipsychotic drugs are administered to appellants because of circumstances that implicate the State’s police power interest. Rather, with respect to appellant Grassi, it appears that these drugs are administered "in order to bring about a re-integration of her current psychotic disorder”, and to "improve” her condition and thus facilitate her return to the community. Similarly, with respect to Rivers and Zatz, the medication is administered because they "are seriously mentally ill” and their condition "would deteriorate if such medication were discontinued or provided in a different manner”.
Thus, respondents appear to rely on the State’s parens patriae interest as justification for overriding appellants’ protests to the administration of these mind-altering drugs. There is no doubt that the State may have a compelling interest, under its parens patriae power, in providing care to its citizens who are unable to care for themselves because of mental illness (Addington v Texas, 441 US 418, 426, supra). For the State to invoke this interest, "the individual himself must be incapable of making a competent decision concerning treatment on his own. Otherwise, the very justification for the state’s purported exercise of its parens patriae power — its citizen’s inability to care for himself * * * would be missing. Therefore, the sine qua non for the state’s use of its parens patriae power as justification for the forceful administration of mind-affecting drugs is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs” (Rogers v Okin, 634 F2d 650, 657, supra; see also, Matter of K. K. B., 609 P2d 747, 750 [Okla], supra). Such a determination is uniquely a judicial, not a medical function (see, Rogers v *497 Commissioner of Dept. of Mental Health, 390 Mass 489, 458 NE2d 308, supra; Matter of Roe, 383 Mass 415, 421 NE2d 40).
We hold, therefore, that in situations where the State’s police power is not implicated, and the patient refuses to consent to the administration of antipsychotic drugs, there must be a judicial determination of whether the patient has the capacity to make a reasoned decision with respect to proposed treatment before the drugs may be administered pursuant to the State’s parens patriae power. The determination should be made at a hearing following exhaustion of the administrative review procedures provided for in 14 NYCRR 27.8. The hearing should be de nova, and the patient should be afforded representation by counsel (Judiciary Law § 35 [1] [a]). The State would bear the burden of demonstrating by clear and convincing evidence the patient’s incapacity to make a treatment decision. If, after duly considering the State’s proof, the evidence offered by the patient, and any independent psychiatric, psychological or medical evidence that the court may choose to procure (see, Judiciary Law § 35 [4]), the court determines that the patient has the capability to make his own treatment decisions, the State shall be precluded from administering antipsychotic drugs.[7] If, however, the court concludes that the patient lacks the capacity to determine the course of his own treatment, the court must determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient’s liberty interest, taking into consideration all relevant circumstances, including the patient’s best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treat *498 ment and any less intrusive alternative treatments. The State would bear the burden to establish by clear and convincing evidence that the proposed treatment meets these criteria.
Based on the foregoing, it is clear that neither mental illness nor institutionalization per se can stand as a justification for overriding an individual’s fundamental right to refuse antipsychotic medication on either police power or parens patriae grounds. Rather, due process requires that a court balance the individual’s liberty interest against the State’s asserted compelling need on the facts of each case to determine whether such medication may be forcibly administered.
The administrative review procedures of 14 NYCRR 27.8 do not sufficiently protect the due process rights of involuntarily committed patients guaranteed by article I, §6 of the New York State Constitution. For instance, the regulations do not articulate the standards to be followed or criteria to be considered at each stage of the administrative process, i.e., what the need is for the particular drug, whether a particular drug is the least intrusive, whether it is capable of producing the least serious side effects, and the proper length of its use. The absence of any standard for determining the permissible duration of forced medication is particularly disturbing. Manifestly, when the medication is necessitated by the patient’s dangerousness, a circumstance that would implicate the State’s police power interest, it may well be that the need would continue only for so long as the dangerous condition exists. The determination would not necessarily imply incapacity and thus would not provide a justifiable basis for the exercise of the State’s parens patriae authority to override the patient’s objection or to continue the medication for a protracted period. When the medication is determined to be necessary in order to care for a patient who is unable to care for himself because of mental illness, the State’s parens patriae power would be implicated, which, as we have said, may only be employed when it has been determined that the patient is unable to make a treatment decision.
Additionally, Mental Hygiene Law § 33.03 (b) (3) requires that "in order to assure protection of patients in their care and treatment [there must be an] order of a staff member operating within the scope of professional license for any treatment or therapy based on appropriate examination”. We deem this requirement applicable to the administrative review process and hold that medical determinations as to the need *499 to administer antipsychotic drugs must honor the patient’s due process rights and be made in accordance with accepted professional judgment, practice and standards.
Finally, we conclude that Special Term did not abuse its discretion in denying the motion for class action certification (CPLR art 9) since application of the principles of stare decisis will adequately protect subsequent litigants (Matter of Martin v Lavine, 39 NY2d 72, 75; see, Siegel, NY Prac § 141, at 180).
Therefore, the order of the Appellate Division should be reversed, with costs, and the matter remitted to Supreme Court, Dutchess County, for further proceedings in accordance with this opinion.
Chief Judge Wachtler and Judges Meyer, Simons, Kaye, Titone and Hancock, Jr., concur.
Order reversed, etc.

. Antipsychotic drugs, also known as "major tranquilizers” and "neuroleptics”, are psychotropic drugs widely used in the treatment of mental illness, especially schizophrenia. Although they do not cure psychotic illness, their medical usefulness stems from their ability to influence thought patterns so as to eliminate psychotic symptoms (see, Eisenberg, Psychiatric Intervention, 229 Scientific Am 116, cited in Davis v Hubbard, 506 F Supp 915, 927; Gaughan and LaRue, The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution, 4 Law & Psych Rev 43, 46). Numerous side effects are associated with their usage, including extrapyramidal symptoms, akathesia, Parkisonisms, dystonie reactions, akinesia and dyskinesia. The most potentially devastating side effect is tardive dyskinesia, an irreversible neurological disorder characterized by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaw and extremities. Although this condition is fairly widespread, it is impossible to predict who will be a victim (see, Plotkin, Limiting the Therapeutic Orgy: Mental Patients’ Right to Refuse Treatment, 72 NW U L Rev 461, 474-479; see generally, Rennie v Klein, 653 F2d 836, 843, vacated 458 US 1119; Rogers v Okin, 478 F Supp 1342, 1360, revd in part 634 F2d 650, 653, n 1, vacated sub nom. Mills v Rogers, 457 US 291, 293, n 1). For a detailed discussion of the adverse side effects of antipsychotic medication, see, Davis v Hubbard (506 F Supp 915, 928-929, supra).

. 14 NYCRR 27.8 provides, in part:
"(c) Review of objection. Prior to initiating a treatment procedure over the objection of a patient, such objection must be reviewed by the head of the service. The decision of the head of the service shall be communicated to the patient and his or her representative, if any, and to the Mental Health *491 Information Service, and treatment may be initiated unless the patient or her or his representative chooses to appeal this decision to the director. The appeal procedure shall be in accordance with subdivision (e) of this section.
"(d) Patient’s right to representative. Patients have the right to request that legal counsel or other concerned person represent them in the formal appeal procedures authorized in this section.
"(e) Appeal. (1) If the patient or a representative of the patient has appealed to the facility director from a decision of the head of the service with respect to an objection to treatment, the director shall consider the appeal and make a decision. The decision of the director shall be communicated to the patient and the patient’s representative, if any, and to the Mental Health Information Service.
"(2) A patient shall also have the right to appeal to the director any decision to which he objects relating to his care and treatment at the facility.
"(3) In cases of facilities in the Department of Mental Hygiene, the patient may appeal from any such decision of the director to the regional director in the department. Such request for review must be filed with the director within five days, excluding Saturdays, Sundays, and holidays, after notification of the director’s decision. The director of the department facility shall forthwith transmit the request to the regional director. When the regional director decides the issue, he shall notify the patient, the patient’s representative, and the director of the Mental Hygiene Information Service of the decision.”

. It is of no consequence that the essence of Grassi’s petition is a challenge to the constitutionality of 14 NYCRR 27.8 and that an article 78 proceeding is "not the proper vehicle” for such a challenge since we can, and do, in reliance on CPLR 103 (c), convert the proceeding to a declaratory judgment action (see, Press v County of Monroe, 50 NY2d 695, 702; Matter of Lakeland Water Dist. v Onondaga County Water Auth., 24 NY2d 400).

. See, Rennie v Klein, 653 F2d 836, 846, vacated and remanded 458 US 1199, on remand 720 F2d 266; Rogers v Okin, 634 F2d 650, 658-659; Scott v Plante, 532 F2d 939; Winters v Miller, 446 F2d 65; Davis v Hubbard, 506 F Supp 915, 935; Matter of Anderson v State of Arizona, 135 Ariz 578, 663 P2d 570; In re Boyd, 403 A2d 744, 747, n 5 [DC Ct App]; Gundy v Pauley, 619 SW2d 730, 731 [Ky]; Rogers v Commissioner of Dept. of Mental Health, 390 Mass 489, 458 NE2d 308, 314; Matter of K. K. B., 609 P2d 747, 749 [Okla]; see also, Sengstack v Sengstack, 4 NY2d 502; Finch v Goldstein, 245 NY 300. But see, Stensvad v Reivitz, 601 F Supp 128.

. See, Therapeutic Orgy, op. cit., 72 NW U L Rev, at 488, and authorities cited therein; Note, A Common Law Remedy For Forcible Medication of the Institutionalized Mentally Ill, 82 Colum L Rev 1720, 1722, n 20 [hereafter cited as Common Law Remedy]; Constitutional Right, op. cit., 8 Bull of Am Academy of Psychiatry & L, at 194-195; Bonnie, The Psychiatric Patient’s Right to Refuse Medication: A Survey of the Legal Issues, at 19, 22, printed in Refusing Treatment in Mental Health Institutions — Values in Conflict [Doudera, Swazey ed; hereafter cited as Refusing Treatment]; Cole, Patients’ Rights v. Doctors’ Rights: Which Should Take Precedence, at 56, 68, printed in Refusing Treatment.

. Any implication that State interests unrelated to the patient’s well-being or those around him can outweigh his fundamental autonomy interest is rejected. Thus, the State’s interest in providing a therapeutic environment, in preserving the time and resources of the hospital staff, in increasing the process of deinstitutionalization and in maintaining the ethical integrity of the medical profession, while important, cannot outweigh the fundamental individual rights here asserted. It is the needs and desires of the individual, not the requirements of the institution, that are paramount.

. One commentator has suggested that the following factors be considered in evaluating capability to consent or to refuse treatment: (1) the person’s knowledge that he has a choice to make; (2) the patient’s ability to understand the available options, their advantages and disadvantages; (3) the patient’s cognitive capacity to consider the relevant factors; (4) the absence of any interfering pathologic perception or belief, such as a delusion concerning the decision; (5) the absence of any interfering emotional state, such as severe manic depression, euphoria or emotional disability; (6) the absence of any interfering pathologic motivational pressure; (7) the absence of any interfering pathologic relationship, such as the conviction of helpless dependency on another person; (8) an awareness of how others view the decision, the general social attitude toward the choices and an understanding of his reason for deviating from that attitude if he does (Michels, Competence to Refuse Treatment, 115, 117-118, printed in Refusing Treatment, op. cit., n 5; see also, Note, The Right to Refuse Antipsychotic Drug Treatment: Substantive Rights and Procedural Guidelines in Massachusetts, 7 W New Eng L Rev 125).