OPINION OF THE COURT
Diané A. Lebedeff, J.
Dramatic event piled upon dramatic event in this case and led to the development and application of novel remedies under article 81 of the Mental Hygiene Law. Although the steps taken were directed by the court on the transcript on each court date, the court reserved the issuance of a written decision until submission of a final order, which has now been presented.
Two issues of legal and moral import were raised — the manner and place of a person’s passing from this life and the need to continue court supervision even after death. Ultimately, the text of article 81 had sufficient power and breadth to permit the court to deal appropriately and effectively with these two subjects.
I
This proceeding started on October 16, 1995, when a petition was presented seeking appointment of a guardian under article 81 of the Mental Hygiene Law for Erica Siracusano, who was approximately 90 years of age and hospitalized. She was widowed, with no relatives within New York State available for decision making. As it developed, Erica Siracusano had been known as Erica Morini during her career as a world famous violinist, and she was the owner of a particularly fine Stradivarius violin purchased when she was young. The violin was kept in a locked closet in her apartment and, within one *132 or two days after the October 19th signing of the petition by the court, it was learned the violin was stolen although the locks on the apartment and closet were apparently intact. A flurry of law enforcement and press interest ensued.
In the meantime, on the more private front, Erica Siracusano’s medical condition were the ills of old age and the information developed by the court evaluator was that her previously well-articulated wish was to be discharged to the home that she loved, even if only to die there. On October 26th, with the support of the court evaluator, a supplemental order granted petitioner the power to arrange her discharge from the hospital. By October 30th, Erica Siracusano was rehospitalized and the court directed a hearing to be held on October 31st.
On October 31st, the court appointed a temporary guardian, as a court may undertake upon a "showing of danger in the reasonably foreseeable future to the health and well being of the alleged incapacitated person, or danger of waste, misappropriation, or loss of the property of the alleged incapacitated person” (Mental Hygiene Law § 81.23 [a] [1]). Property issues were posed by the theft. As to well-being, it was demonstrated that someone was required to make comprehensive medical judgments, with the ability to address the court on the foreseeable topics of involuntary feeding and the aggressiveness of life-preserving efforts, complex issues involving respect for the "patient’s wishes, including the patient’s religious and moral beliefs, or if the patient’s wishes are not known and cannot be ascertained with reasonable diligence, in accordance with the person’s best interests, including a consideration of the dignity and uniqueness of every person” and other factors (Mental Hygiene Law § 81.22 [a] [8]), although the statute itself takes no position on the court’s power regarding life-sustaining treatment (Mental Hygiene Law § 81.29 [e]). Despite her medical condition, discharge to her home remained medically feasible and, given the information of Ms. Siracusano’s strong and oft-repeated desire,, that move was seen as supported by the tenor of the statute which encourages facilitation of a home placement where possible (Mental Hygiene Law § 81.22 [a] [9]).
The special guardian made appropriate arrangements for home care with full medical support. Without further medical emergency, Erica Siracusano was reported to have been pleased and comforted to be home. She was not told of the theft. As she desired, she passed away in her bed in peace. There was no need for consideration of forced hydration or nutrition.
That this period was short did not defeat the success of the special guardian’s efforts. Erica Siracusano released her mortal *133 coils in a natural fashion at an appropriate age after a full and successful life, at the place she desired to be. Who of us could wish for a better end? And, as a judicial function, this outcome most honored the thought, so well expressed by Judge Fritz W. Alexander, II, that "[i]n our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding * * * medical treatment in order to insure that the greatest possible protection is accorded * * * autonomy and freedom from unwanted interference with the furtherance of [individual] desires” (Rivers v Katz, 67 NY2d 485, 493 [1986]). Ms. Sircusano required someone to make these arrangements for her.
Article 81 of the Mental Hygiene Law had a broad enough sweep to facilitate this desired end, even prior to the final determination on the petition. The court had before it the necessary resources. The petitioner was a friend of 40 years standing of Erica Siracusano and her accountant and was able to advise the court of many of her wishes. The court evaluator, Michael Miller, a well-respected elder law lawyer with a deep wisdom and the deepest known knowledge of article 81, advised the court of his thorough investigation and his conclusions and recommendations regarding the wishes of the alleged incompetent. The special guardian, Harold A. Mayerson, a skilled attorney, undertook his tasks with remarkable expedition, thoroughness and fidelity to the goals he was to accomplish.
II
Ms. Siracusano’s death did not conclude this matter. The criminal investigation remained, which had not ruled out as suspects any individual previously involved with Ms. Siracusano. Friends, associates and relatives remained as suspects in this locked closet mystery worthy of John Dickerson Carr.
Further, efforts to recover the violin were clearly timely and had some hope of eventual success. This hope was important to the estate for the Stradivarius, worth some $3 million, had been insured for only $800,000. Ms. Siracusano had left her estate to charities benefiting the aged, the infirm and the young, and the theft was deeply detrimental to those she had named as most deserving of her charity.
Law enforcement also opined that disposition of the violin would be difficult and that there was a possibility that the violin might be produced. Accordingly, it was recommended that a reward be posted.
*134 The court continued the special guardianship, mandating that the special guardian make immediate application to the Surrogate’s Court for direction. The statute provides a degree of flexibility upon death of the subject of a guardianship for it states that the court "shall discharge such guardian, or modify the powers of the guardian where appropriate, if it appears * * * that * * * the incapacitated person dies” (Mental Hygiene Law § 81.36 [a] [3]). In relation to property, the duty of a guardian includes a duty to "preserve, protect, and account for such property and financial resources faithfully” (Mental Hygiene Law § 81.20 [a] [6] [ii]) and "at the termination of the appointment, [to] deliver such property to the person legally entitled to it” (Mental Hygiene Law § 81.20 [a] [6] [v]).
The court also authorized the guardian to offer a reward of $100,000 from the funds then under his control. Because the special guardianship was to continue for only a limited period of time, the reward was to be available for the actual production of the violin to the guardian during the period of the guardianship. The reward did capture public interest and the guardian advised that he received a number of communications of interest. The guardian was able to continue to facilitate the investigations being conducted by the Federal Bureau of Investigation and the New York City Police Department, as well as to secure the apartment for their further investigation.
Here, had the guardianship been allowed to lapse, no one would have been empowered to take necessary action. Further judicial action by the Supreme Court was recommended by the court evaluator, who had contacted family members and friends as a part of his investigation. His information indicated that a will contest might develop, as well that there might be a challenge to the executor named in the last known will. Thus, there was no assurance that anyone would rapidly proceed to the Surrogate’s Court or that disputes there would be capable of swift resolution. Present also was the disturbing knowledge that some delay might be caused by those who had not yet been cleared as suspects.
A lack of judicial action would have granted a safe harbor to the unknown wrongdoer who had preyed upon the decedent, stealing her most prized possession, possibly with the thought that a legally effective response could not occur for an extended period after her anticipated death. This court does not envision that the Legislature created so feeble a remedial structure that a court is divested of power at a time when action is necessary. This court directed the guardian to continue his efforts *135 to protect the property of the estate and, acting as an officer of the Supreme Court, to place the issues rapidly before the proper court with comprehensive jurisdiction which could continue supervision of the matter. On November 14, 1995, Surrogate Eve Preminger appointed the guardian as a Temporary Limited Administrator with continuing power to cooperate with law enforcement personnel and to offer the reward.
This matter is now concluded in this court. The court herewith has signed the order discharging the special guardian and resolving all issues. The court has, within the limits of its jurisdiction, satisfied the needs of Erica Siracusano at the close of her life and in her death so that she might rest in peace.