OPINION OF THE COURT
Robert F. Julian, J.
On September 25, 2006, petitioner, Scott Perra, acting in his capacity as executive vice-president and chief operating officer of Faxton-St. Luke’s Healthcare, made an application, pursuant to section 9.33 of the Mental Hygiene Law, to retain respondent, Theresa Doe, for involuntary care and treatment at Faxton-St. Luke’s for a period not to exceed six months. This was accompanied by an application for an order for the administration of the drug Risperdal over respondent’s objection. Respondent opposes both applications and opposes any further pharmacological treatment at Faxton-St. Luke’s.
Respondent is a 23-year-old pregnant female who has been suffering from, and has been taking medication for, mental illness since the age of 14. On September 2, 2006, respondent was escorted by the police from the local train station, where she had been acting in a bizarre and irrational manner, and brought to the emergency room at Faxton-St. Luke’s. Pursuant to section 9.27 of the Mental Hygiene Law, she was involuntarily admitted to Faxton-St. Luke’s psychiatric ward. Respondent was diagnosed by Dr. Bahram Omidian, the physician who performed the initial examinations, as suffering from paranoid schizophrenia. At the time of her admission, respondent was 21 weeks’ pregnant. Respondent had been receiving treatment for her mental illness from an outpatient clinic affiliated with the Mohawk Valley Psychiatric Center. This treatment consisted of receiving injections of Risperdal, an antipsychotic medication, but respondent had last received this medication two weeks prior to being brought into Faxton-St. Luke’s and was due for another dosing. Respondent, however, refused to be medicated, claiming “I don’t take medication, because I’m pregnant.” Dr. *440 Omidian recommended, nevertheless, that respondent be put on antipsychotic medication to induce a remission of her illness. As a result of her refusal to take medication, respondent was then examined by Dr. B.E. Fard, of Faxton-St. Luke’s, in order to further assess her competence to make decisions regarding her medical care. Dr. Fard observed that respondent was “disorganized and confused; unable to process provided info,” and, additionally, that respondent suffered from “impaired judgment.” Faxton-St. Luke’s seeks an order to retain respondent involuntarily as their physicians have determined that, without treatment, respondent is a danger to herself and her fetus.
Section 9.33 (a) of the Mental Hygiene Law requires the petitioner to assess whether a patient “is in need of retention.” Section 9.01 of the Mental Hygiene Law defines this phrase of art as meaning “in need of involuntary care and treatment,” which, according to section 9.01, “means that a person has a mental illness for which care and treatment as a patient in a hospital is essential to such person’s welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment.” In order to authorize continued retention of an involuntary patient, as requested of the court by the petitioner, per section 9.33 of the Mental Hygiene Law, the court must determine whether the petitioner has properly established that the patient is in need of retention. It has been held that a petitioner seeking to retain an involuntary patient must demonstrate, “by clear and convincing evidence, that the patient is mentally ill and in need of continued, supervised care and treatment, and that the patient poses a substantial threat of physical harm to h[er]self and/or others.” (Matter of Consilvio v Diana W., 269 AD2d 310, 311 [1st Dept 2000].) Mere showing of mental illness or eccentricity is insufficient to retain a patient involuntarily admitted to a mental facility. (Matter of Carl C., 126 AD2d 640 [2d Dept 1987].)
There is a tension between the need to respect the autonomy principles that drive our society and guide our health system, and the need for the State to use its power to protect those whose decision-making capabilities are nonexistent or muddled. (Rivers v Katz, 67 NY2d 485 [1986].) In Rivers, the petitioners were seeking to medicate a group of involuntarily confined mental patients. The Court of Appeals held that even for those determined to be mentally ill and in need of involuntary commitment:
“In situations where the State’s police power is not *441 implicated [i.e., the public safety is not at issue], and [a mentally ill] patient [who has been involuntarily confined to a State facility] refuses to consent to the administration of antipsychotic drugs, there must be a judicial determination of whether the patient has the capacity to make a reasoned decision with respect to proposed treatment before the drugs may be administered pursuant to the State’s parens patriae power.” (Id. at 497.)
And, even if the patient is determined not to have sufficient reasoning ability to meaningfully object, the proposed treatment must be narrowly tailored to give substantive effect to the patient’s liberty interest, taking into consideration all relevant circumstances. (Id.) Furthermore, the Court set out criteria by which to make these determinations, namely: the person’s knowledge with respect to available choices; cognitive ability; presence of pathological delusions or emotional state that would interfere with a rational decision-making process; and the awareness of prevailing social attitudes. (Id. at 498.)
The petitioner has met the burden of establishing, through clear and convincing evidence, that respondent is suffering from a mental illness which necessitates hospitalization and treatment; moreover, the petitioner has established that, as a result of this, respondent’s judgment is unsound and her understanding of her condition is, in terms both specific and general, for practical purposes, nonexistent.
Petitioner provided the court with three detailed evaluations taken by two different physicians which provide a thorough, expert assessment of respondent. One of the physicians, Dr. Omidian, described her as “rather quite delusional and disorganized, as having poor concentration and attention, and suffering from some degree of paranoia and persecutory delusional ideation.” In addition, Dr. Omidian assessed respondent’s intellectual capabilities and found that, “intellectually [she] is hard to be defined considering her poverty of thoughts and looseness of association . . . [J]udgment seemed to be marginal.”
Respondent’s refusal of Risperdal stems from her notion that medication will harm her child, as well as her intention to help herself treat her schizophrenia. However, in the opinion of the physicians who examined her, without the benefit of medication, her ability to engage in rational, critical risk analysis is suspect. Keeping in mind the Rivers criteria, and judging from the expert reports provided by the petitioner, respondent’s state *442 of mind is most readily and recurrently characterized by a lack of serious cognition, a wealth of misconceptions, and, fundamentally, a lack of awareness. In the opinion of Dr. Omidian, who, in addition to examining respondent, spoke with her previous physician about respondent’s history, respondent does not have the capacity to make decisions with respect to treatment. Furthermore, he stated that respondent had a poor awareness of the full risk benefit, e.g., when she is advised that in spite of the fact that medication can be harmful to her and her baby at the same time not taking medication can have the similar adverse result. Dr. Omidian characterizes her as such: “The patient tends to rationalize and repeat only one thing without understanding the whole risk and benefit.” Dr. Fard opined that, were respondent not to receive medical treatment to treat her schizophrenia, she would be a danger to herself and her fetus. This was echoed by Dr. Omidian when he stated that “[respondent] prior to her admission apparently was not able to take care of herself.” Moreover Dr. Omidian opined that without the Risperdal the respondent would further decompensate, posing a risk to herself and her fetus. For example, despite being five-months pregnant, respondent was unaware of this change in her physical condition until she was informed by the hospital. In view of the expert assessments the petitioner has provided and the anecdotal evidence detailing respondent’s own actions, the court finds that petitioner has met its burden in showing, through clear and convincing evidence, that respondent is in need of medical treatment, as per the definition of section 9.39 of the Mental Hygiene Law. Accordingly, the court orders that, pursuant to petitioner’s request, respondent be retained at Faxton-St. Luke’s Healthcare for further treatment for no less than six months.
Respondent’s refusal of Risperdal requires further consideration. The court is mindful that the principles of autonomy that are the basis of our society and our health care system are not to be taken lightly, and that governmental power to interfere in treatment decisions has been rightly tempered by a respect for a patient’s autonomy. (Rivers v Katz, 67 NY2d 485 [1986].) It is clear, however, that respondent does not, at present, have the capacity to make rational decisions regarding her health or the health of her fetus. Dr. Omidian stresses that, provided she takes her medication, she can “go on with her life and hopefully [have] an uneventful pregnancy . . . [L]ack of [treatment] will be causing further progression in the patient’s psychiatric *443 symptoms and unfortunately would be detrimental to the patient’s fetus.”
Respondent asserts that the health and well-being of the fetus will be adversely impacted by a Rivers order permitting the administration of Risperdal. The respondent had been treated in outpatient services with injectable Risperdal to apparently no known ill effect to her or her pregnancy at that time. According to Dr. Omidian, Risperdal has “not been proven by documentation of having any fetal side effect.” However, respondent claims that Risperdal poses an unacceptable risk to the fetus and objects to its administration. Respondent moved for the introduction of the Physicians’ Desk Reference (PDR) regarding Risperdal.
The court hereby admits the PDR for the limited purpose of ascertaining the manufacturer’s representation to physicians, the general public, and the Food and Drug Administration (FDA) as to the drug’s safety and effectiveness. The PDR listing for Risperdal, as to its effect on pregnancy, reads as follows: “There are no adequate and well-controlled studies in pregnant women [as to the effect of the medication on their pregnancies].” (Physicians’ Desk Reference, at 1744 [59th ed 2005].) Furthermore, according to the listing in the PDR, there is no measurable causal effect between taking Risperdal and any effect on fetal health or any other pregnancy or delivery complications, save for one example where a fetus suffered from agenesis of the corpus callosum.[2] The PDR listing for Risperdal advises that “[It] should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.” (Physicians’ Desk Reference, at 1744 [59th ed 2005].)
The PDR is a compilation of manufacturer-supplied prescription information and labeling for FDA-approved pharmaceuticals. In order for a pharmaceutical manufacturer to comply with regulations promulgated under the Food and Drug Act, the labeling for its product must “contain a summary of the es *444 sential scientific information needed for the safe and effective use of the drug . . . based whenever possible on data derived from human experience.” (21 CFR 201.56 [a] [1], [3].) Among the information a manufacturer must include in its labeling and submit to the FDA are contraindications, warnings and precautions, and adverse reactions, relating to use of the drug. (21 CFR 201.56 [d] [1].) Furthermore, the language in the PDR entry for the drug regarding this information must be the same in language and emphasis as the approved labeling for the product. (21 CFR 201.100 [d] [1].) Thus, as the scientific evidence detailed in the PDR is no different in language or in substance from the scientific evidence submitted to the FDA, and, as the manufacturer is required to meet stringent scientific standards for approval, the language in the PDR is what the manufacturer is holding out to physicians and patients as the drug’s properties and effects. Unlike Rosario v New York City Health & Hosps. Corp. (87 AD2d 211 [1st Dept 1982]) and People v Jones (73 NY2d 427 [1989]), the entry for Risperdal is not offered for its truth, but rather for the limited purpose of showing the manufacturer’s representations as to the drug’s neonatal and fetal effects, and, thusly, showing what information a reasonable person and physician would see when consulting the PDR prior to treatment. There is a difference of opinion between the physicians and respondent as to the desirability of pharmacological treatment. Recognizing, as above, that the respondent does not have the capacity to make informed decisions regarding medical treatment, nevertheless the court recognizes the importance of autonomy principles, and is leery of granting to a medical institution the power to act not merely in the fetus’ best interests, but to essentially usurp what would be a normal, functional mother’s role. Clearly, however, as discussed above, the respondent cannot presently fulfill the role of a normal, functioning mother, capable of making treatment decisions for herself or her fetus. Dr. Omidian acknowledges that retaining the respondent in the hospital without Risperdal will accord her the protection of a safe environment and allow the hospital to further apply to this court should Risperdal be required. Therefore, petitioner’s application for an order for treatment over objection is denied without prejudice to reapply in the event of respondent’s further decompensation prior to delivery of the fetus.
Prior to the Rivers hearing, the court became aware that the mother had been smoking heavily while in the hospital. The *445 hospital is to become a smoke-free environment on November 15, 2006. Confronted with this at the Rivers hearing, respondent demonstrated a striking lack of cognizance as to the effect her smoking might have on her fetus; indeed, respondent has a poor conception of the effect of her general behavior as it affects the health of the fetus. Respondent proceeded to justify her smoking habit, claiming that smoking cigarettes helped reduce her appetite so that she wouldn’t be as hungry and eat as much.
The court takes judicial notice that smoking while pregnant has a harmful effect on the fetus, leading to the increased possibility of sudden infant death syndrome (SIDS) after the baby is born. It is well-established that notorious facts relating to human life can be judicially noticed. (Prince, Richardson on Evidence § 2-204 et seq. [Farrell 11th ed].) In a negligence action for injuries suffered as a result of plaintiff breathing in silica dust at his place of work, in determining whether plaintiff had been furnished a safe place to work, the Court of Appeals noticed that it was a matter of common knowledge that breathing silica dust was harmful to lungs, and noted that medical testimony had shown that as well. (Sadowski v Long Is. R.R. Co., 292 NY 448 [1944].) Furthermore, scientific facts which are generally known will be judicially noticed; indeed, courts have taken judicial notice of facts by reference to sources of indisputable reliability. (Prince, Richardson on Evidence § 2-204 [Farrell 11th ed].)
In this instance, the court bases its notice on the 2006 Surgeon General’s report entitled “The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General” as a source of indisputably reliable scientific facts; furthermore, the court notices this fact as a well-known, well-publicized fact relating to human life. The Surgeon General’s report is a document created by the Office of the Surgeon General and the United States Department of Health and Human Services. The report collects and analyzes the vast amount of research, both past and current, performed in the area of tobacco smoking and its effects on various aspects of health. The Surgeon General has released its report documenting the health effects of tobacco smoke since 1977 (US Dept of Health and Human Servs, The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General, at i [2006 Surgeon Gen Report]). Since that time, the Surgeon General’s report has been much discussed and its findings much publicized in the years since, such that no reasonable *446 person could state their lack of awareness as to the deleterious effects of tobacco smoking. Indeed, the findings of the Surgeon General are so well respected and well publicized that other nations, such as Great Britain, base their antismoking laws on the Surgeon General’s reports. (Bar Workers’ Health Improves Rapidly After Smoking Banned, Consumer Affairs, Oct. 10, 2006, <http://www.consumeraffairs.com/news04/2006/10/ tobacco_bar_workers.html>, cached at <http://www.courts. state.ny.us/reporter/webdocs/BarWorkersHealthlmprovesRapidlyAfterSmokingBanned.htmx)
It was stated, in the Surgeon General’s most recent report, that “[njumerous studies have examined the association between active smoking among mothers during pregnancy and the subsequent risk of SIDS. The evidence . . . has demonstrated a causal association between maternal smoking during pregnancy and SIDS (Anderson and Cook 1997; United Kingdom Department of Health 1998; USDHHS 2001).” (2006 Surgeon Gen Report, at 180.) Thus, in view of this, it cannot be denied that respondent’s smoking habit poses a risk to her fetus. The respondent was unable to comprehend the risk to her fetus posed by her smoking, further reenforcing that she presently lacks the competence to make decisions for herself and her fetus. It must be made clear to respondent that, if she is concerned about the health of her fetus, indeed, her own health, she is to stop smoking at once, and that it is incumbent upon the petitioner to take reasonable steps to ensure that she does so for her sake and the sake of her fetus, including an aggressive smoking cessation program.[3]
It is not a contradiction to assert that petitioner can involuntarily retain respondent and override her refusal of further retention and nonpharmacological treatment, and, yet, also assert that, nevertheless, petitioner does not have the untrammeled right to provide whatever pharmacological treatment it deems appropriate. Both assertions are based on the interest of the State in preserving the fetus’ viability and good health upon birth. As Dr. Omidian has made clear, if respondent is released, her lack of judgment and refusal to medicate makes her a danger to the fetus, as well as herself. On the other hand, while it is not for the court to second-guess the physicians’ assessment of the danger, or lack thereof, the medication poses to the fetus, it is nonetheless in the interest of the viable fetus to have a party representing it as its mother would in any similar situation where the mother was competent.
*447 Judge Cardozo’s famous dictum in Schloendorff v Society of N.Y. Hosp. (211 NY 125, 129 [1914]) encapsulates the right of informed consent: “Every human being of adult years and sound mind has a right to determine what shall be done with his own body.” The concept of informed consent has further been expanded such that it has been held that where a medical procedure or pharmacological treatment is proposed for a pregnant woman with a viable fetus, the woman gives consent not only for herself but also for her fetus. (Hughson v St. Francis Hosp. of Port Jervis, 92 AD2d 131 [2d Dept 1983].) Respondent is presently unable to give such consent by virtue of her psychiatric condition. Consequently, any further order for medication or a resumption of permission to smoke shall occur only upon further application to this court.

. Agenesis of the corpus callosum is defined by the National Institute of Neurological Disorders and Stroke (NINDS) as
“a birth defect in which the structure that connects the two hemispheres of the brain ... is partially or completely absent. [It] can occur as an isolated condition or in combination with other cerebral abnormalities ....
“Prognosis depends on the extent and severity of malformations . . . [M]any children with the disorder have average intelligence and lead normal lives.” (NINDS Agenesis of the Corpus Callosum Information Page, <http://www.ninds.nih.gov/disorders/agenesis/ agenesis.htm> [last updated Jan. 23, 2006], cached at <http:// www.courts.state.ny.us/reporter/webdocs/ninds.htm>).

. While the petitioner hospital is not presently smoke free, the Mohawk Valley Psychiatric Center is.