OPINION OF THE COURT
Alan C. Marin, J.
*844 This is the decision following the liability trial of Jacob Cohen’s claim alleging that he was injured during the involuntary drawing of his blood on October 13, 2004 while a patient at Kingsboro Psychiatric Center. Mr. Cohen, who was then 37 years old, had a long-standing history of mental illness with numerous psychiatric hospitalizations.[1]
Claimant’s previous admission to Kingsboro Psychiatric had been on August 11, 2003. He was discharged on May 17, 2004 to a nonhospital setting, New Beginnings. However, less than a week later, Cohen was admitted to Kings County Hospital for “agitation, depression and paranoid ideation,” where he remained until his September 10, 2004 transfer to the Kingsboro Psychiatric facility as an involuntary, civil admission. (Claimant’s exhibit 4, first unnumbered page.)
Two witnesses took the stand at trial: claimant and Dr. Jolanta Gurdek, Cohen’s treating psychiatrist during the relevant period, September and October of 2004. Dr. Gurdek testified that the diagnosis for Mr. Cohen was bipolar disorder with borderline personality disorder. The psychiatrist agreed that claimant had what, in lay terms, would be known as “anger management issues.”
At the time, Cohen was taking four medications for his mental condition; in addition, he was on medications to control his blood pressure, cholesterol and thyroid. Dr. Gurdek testified, without challenge, that blood screening was medically appropriate. According to Gurdek, as of October 13, no screening had been done since Mr. Cohen’s admission to Kingsboro on September 10.
On Friday, October 8, 2004, Dr. Mark Lerman,[2] the clinical director of the Kingsboro Psychiatric Center, drafted a letter to Cohen, which in relevant part provided as follows:
“It has come to my attention that regrettably you have objected to the procedure of phlebotomy to obtain blood to monitor your health . . . [Y]ou need periodic blood monitoring to help promote your health . . . Your doctors and I wish to encourage your voluntary cooperation ... I therefore, strongly recommend you submitting to your doctor’s recommendation of phlebotomy.” (Claimant’s exhibit 2.)
*845 Dr. Herman’s letter advised that Cohen should “discuss fully [his] thoughts” on the issue with Dr. Gurdek and Dr. Peter-man.[3] It went on to discuss the process if Cohen refused to consent: “You may appeal our decision to obtain blood work from you to the Director of this institution, Mr. Dean Weinstock. Please communicate your decision to Dr. Gurdek as soon as possible. If you are dissatisfied with Mr. Weinstock’s [ruling], you [may] appeal his decision to the Commissioner of OMH.” Five individuals were copied on the letter including Dr. Gurdek, Dean Weinstock and Mental Hygiene Legal Service (MHLS).
Dr. Herman’s letter clearly acknowledged claimant’s opposition to having his blood drawn, but Dr. Gurdek testified that she did not “execute the letter because the patient promised me to have it done willingly on Tuesday morning [October 12].” Cohen, by this time, had written a note indicating his opposition and slipped it under the office door of Dr. Gurdek, who initialed it as having been received at 8:30 a.m. (on Oct. 12, 2004). Claimant had not yet seen Dr. Herman’s letter — Dr. Gurdek stated that claimant’s note was not in response to it (she had waited to deliver Herman’s letter). Cohen’s note read as follows: “I have decided not to have my blood drawn. Please, do not confront me! I am in bad shape. I may lose control of myself if you fight with me! Jake Cohen” (claimant’s exhibit 1).
Later that day (Gurdek’s notation was 2:06 p.m.), the psychiatrist received another note from Cohen who had by now received Dr. Herman’s letter: he had written on the back of it, and declared, “The Answer is NO!!! I will resist!! I have jail experience! Jake” (claimant’s exhibit 2).
Dr. Gurdek credibly testified that she had multiple conversations with Dr. Herman’s office and multiple conversations or “attempts to converse with Mr. Cohen and convince him of compliance with the blood drawing, [and] another conversation on the day of the blood drawing.” Moreover, Dr. Gurdek further recalled, and again credibly so, meeting twice with Bruce Harris of Mental Hygiene Legal Service, once after receipt of the first letter and then sometime in the afternoon (it was unclear whether this was before or after receipt of Cohen’s second letter).
Dr. Gurdek said she spoke to Mr. Harris about claimant’s refusals, and Harris said he had spoken to Cohen. Gurdek *846 acknowledged Cohen’s right to appeal from the decision to have his blood drawn, adding in her testimony that whenever there is an issue with regard to drawing blood against a patient’s wishes, Kingsboro Psychiatric contacts MHLS.
The Events of October 13
Cohen was watching television in the dayroom on ward 11 with 15 or 20 other patients. An announcement was broadcast that assistance was needed in the ward. Dr. Gurdek was in the chart room, heard the announcement, and could see claimant through the window in the wall between the two rooms. As Gurdek recalled, staff had come in slowly; the patients had begun to leave when they heard the announcement, but not every patient left, and those remaining were asked to do so. Dr. Gurdek stated that a member of the response team had a good rapport with Cohen and tried to talk to claimant and persuade him to comply with the procedure.
Eventually, about 10 safety officers and mental hygiene therapy aides (MHTAs) responded to the call and had come into the room. By this time, Dr. Gurdek was there as well, and recalled that Cohen “was standing up with his hands on his sides, with the fists clenched, and he was saying, ‘I’m going to fight. I’m going to kill someone . . . I’m going to resist.’ ” Cohen, on the stand, denied ever raising or clenching his fists.
Things, as Dr. Gurdek remarked, were moving quickly. Gurdek testified that there were “at least, two safety officers, I think, just next to Mr. Cohen and, probably, one MHTA trying to contain him because he was physically attacking her and resisting people who were around him.”
Dr. Gurdek softened her initial testimony as to whether she had seen Cohen “taking swings,” but maintained that “he was in a position of attacking them.” In any event, the witness saw a struggle and, at some point, “I just saw him on the . . . ground.”
For his part, claimant recalls being in the dayroom with other patients that morning, from where he could see Dr. Gurdek in the chart room. Dr. Peterman approached him, and, according to claimant, said, “we can either do this the easy way or . . . the hard way.” Cohen testified he responded as follows: “So I told him that my request to go before Judge Catrona is reasonable, it’s a very good compromise, but if you’re not going to go through the proper channels and grant my appeal, I’m not going to have my blood drawn. I refuse.”
*847 Cohen said he continued watching television, noticed Dr. Peterman walk into the chart room, and that then Dr. Gurdek picked up the phone. After about a minute, recalled claimant, he heard “Code” being called: “attention all staff, attention all staff, Ward 11 is requesting your assistance, Ward 11 is requesting your assistance.”
Cohen recalled that, at first, three safety officers showed up at one time and then 10 or 15 more, or a total of 10 or 15, claimant was unsure. Claimant said he was standing with his arms at his sides, that two employees approached him quickly, each grabbing an arm and “the rest of them knocked me down to the floor.” Cohen later complained of pain in his left ankle, and X-rays taken the next day showed a fracture of the fibula. (Claimant’s exhibit 4, Oct. 14, 2004 notes.)
Preliminarily, the facts here did not constitute an emergency, as occurred the time when Mr. Cohen was found to be striking his head against the wall, and Dr. Gurdek quickly administered medication to calm Cohen for his immediate safety. As the psychiatrist testified: “When there is an imminent danger to the staff or to the patient, I have to make the decision on my own, and if I need to medicate the patient, I can do it without administrative decision.”
With that said, every individual, including one under involuntary commitment to a psychiatric hospital, has the fundamental “right to determine what shall be done with his own body . . . and to control the course of his medical treatment.” (Rivers v Katz, 67 NY2d 485, 492 [1986] [citations and internal quotation marks omitted].) It was undisputed that the drawing of Cohen’s blood was an invasive procedure, with respect to which the patient had the right to be involved in the decision-making process.
At the time Rivers was decided, there was an existing regulation of the Commissioner of Mental Health entitled, “Care and treatment; right to object and appeal” (14 NYCRR 27.8), which was in large part quoted in footnote 2 of the Rivers decision (at 490). Rivers v Katz involved the administration of antipsychotic drugs, described by the Court of Appeals as having potentially serious side effects (67 NY2d at 490 n 1).
*848 Following Rivers, a new set of regulations was promulgated, 14 NYCRR part 527, “Rights of Patients.”[4] Section 527.8, which is entitled “Care and treatment; right to object,” established a procedure containing the due process safeguards that the Court of Appeals found lacking in Rivers. Such includes judicial authorization following a determination of whether the patient is capable of giving reasoned consent to a proposed medical procedure. However, paragraph (7) of subdivision (a) specifically excludes “routine blood work” from the ambit of section 527.8.
The preexisting regulation, section 27.8, remains in effect[5] and covers routine blood testing. It provides[6] that patients held on an involuntary status may be given treatment over their objection only if there is compliance with the procedures set forth therein. Initially, under subdivision (c) of section 27.8, if the patient objects to the planned treatment, the facility’s head of service must undertake a review, and the resulting decision must be communicated to the patient (and his representative, if he or she has one), as well as to MHLS. This was Dr. Lerman’s letter of October 8.
The proposed treatment may then be undertaken unless the patient (or his representative) decides to appeal to the facility director, which at Kingsboro is Dean Weinstock (id.). Appeals are governed by subdivision (e); paragraphs (1) and (3) of section 27.8 (e) provide as follows:
“(e) Appeal
“(1) If the patient or a representative of the patient has appealed to the facility director from a decision of the head of the service with respect to an objection to treatment, the director shall consider the appeal and make a decision. The decision of the director shall be communicated to the patient and the patient’s representative, if any, and to the Mental Health Information Service. . . .
“(3) In cases of facilities operated by the Office of *849 Mental Health [OMH], the patient may appeal from any such decision of the director to the commissioner or his or her designee. Such request for review must be filed with the director within five days, excluding Saturdays, Sundays and holidays, after notification of the director’s decision. The director of the facility shall forthwith transmit the request to the commissioner or his or her designee. When the commissioner or his or her designee decides the issue, the patient, the patient’s representative, and the director of the Mental Hygiene Legal Service shall be notified of the decision.”[7]
Dr. Lerman’s letter stated that Cohen had the right to appeal to the facility and that he should communicate his decision to Dr. Gurdek “as soon as possible.” There is no time frame specified in subdivision (c), but the appeal under subdivision (e), from the director’s decision to the Commissioner, is apparently intended to move on an expedited basis. As set out above, a request to the Commissioner to review a director’s decision must be made within five days, excluding weekends and holidays, and be “forthwith” transmitted to the Commissioner’s Office. Defendant does not argue that the time for an appeal to Director Weinstock is less than five days. As Dr. Gurdek commented, “[T]he MHLS has to have time to talk to the patient, and if they choose to go with that appeal in writing or verbally appeal the situation, you have to give them some time.”
In the view of this trier of fact, relying upon Dr. Gurdek’s testimony, Dr. Lerman’s letter was not delivered to the patient until Tuesday, October 12, and Cohen’s blood was forcibly taken from him the next day. There was no probative evidence that Cohen had indicated in writing, or orally, that he decided not to appeal to Director Weinstock. In fact, his refusal or objections, while not formal, were unmistakable and unequivocal. That claimant objected to the blood work was not seriously called into question by defendant.
We never heard directly from Harris of MHLS. Dr. Gurdek testified she spoke with him twice, and had he advised Cohen to relent, such was never received into evidence. The language of subdivision (a) of section 27.8 suggests that objecting and appealing may be distinct actions: “Patients may object to any *850 form of care and treatment and may appeal decisions with which they disagree.” Dr. Gurdek testified that she did not consider Cohen’s first note to be an appeal: “No, it was a written statement about [the] possibility of fighting people. And I had a conversation with his MHLS [representative] indicating that they can appeal the situation.” Even assuming that claimant’s two notes represented objections only, there was no indication that he had decided to forgo an appeal.
Cohen mentions a second MHLS lawyer that he recalls speaking to, a Michael Nevel. Explaining his conversations with Messrs. Harris and Nevel, claimant is understandably confused about when a court order may be required for an involuntary OMH patient who refuses medical treatment. Judicial intervention is part of section 527.8, not of section 27.8. But the totality of what we have from Cohen — his notes, his testimony, and Dr. Gurdek’s recollections of conversation with claimant — indicates that he did not consent to the procedure and wanted to resist to the maximum extent as he understood his rights.
A patient in these circumstances who is subject to a proposed invasive procedure is entitled, unless he clearly indicates his consent, to an evaluative decision (presumably reduced to writing) at three levels: by the head of the service, the facility director, and the Commissioner of the Office of Mental Health. In our case, the decision on the nonconsenting Mr. Cohen did not make it beyond the first level.
Defendant failed to follow the rules and regulations governing the Office of Mental Health, a failure of its duty toward the patient claimant. This failure was negligence: defendant’s conduct was unreasonable in proportion to the risk of injury; no cost or burden of any consequence — operational or medical— was shown that would have been implicated had the procedures set by state regulation been utilized.
Granted, it was possible that had each procedural step been followed, Mr. Cohen would still have been unwilling to allow his blood to be drawn, and would have been ultimately forced to do so. In any event, by failing to let the process run its course, defendant appreciably increased the chance that a physical imposition would be required with its attendant dangers.
Failure to abide by the official promulgated regulations of the State of New York is not, by itself, actionable (see PJI 2:29). What transpired — a struggle resulting in injury — was reasonably foreseeable. Dr. Gurdek testified that she made sure her view of the “proceeding” was not blocked, “Because I wanted to *851 make sure that everything is okay with them and . . . that no one is going to get injured,” significantly adding, “From our experience . . . when we are dealing with medicating patients against their will, or taking blood, sometimes things can go wrong and some people can be injured.” In that regard, the code call did not summon one or two employees, but closer to a dozen safety officers and therapy aides — once this stage was reached, a substantial escalation had occurred, and defendant knew it.
It is thus unnecessary to determine whether excessive force was used, or whether defendant’s employees varied from the proper procedures in their use of physical restraint. (See e.g. Patrick v State of New York, 11 Misc 3d 296 [Ct Cl 2005]; Santana v State of New York, Ct Cl, Sept. 22, 2006, Marin, J., claim No. 107304, UID No. 2006-016-062.)[8]
In view of the foregoing, I find that when Jacob Cohen was physically forced to give blood on October 13, 2004, such constituted negligence on the part of the State of New York, which was the proximate cause of any injury suffered at such time by Mr. Cohen, for which defendant is fully liable.

. Claimant’s exhibit 4, ninth unnumbered page, notes of psychiatrist Dr. K. Win-Gaw.

. The doctor’s last name is spelled in the trial transcript as “Lairman.”

. Dr. Peterman’s full name is not referenced in the transcript or medical records in evidence (claimant’s exhibits 1-4).

. Part 527 covers the Office of Mental Health (OMH). The State Department of Mental Hygiene is comprised of the OMH, the Office of Mental Retardation and Developmental Disabilities, and the Office of Alcoholism and Substance Abuse Services.

. See Matter of Adam S. (285 AD2d 175 [2d Dept 2001]). Note that section 527.8 (c) (5) references section 27.9; subdivision (f) of section 27.9 provides that patients who object to the surgery and other treatments covered by section 27.9 have recourse to the procedures governing objection and appeal in section 27.8.

. Specifically, see section 27.8 (b) (3) (i).

. Paragraph (2) of subdivision (e) is not directly applicable, but is illustrative of the scope of the procedural protections in place: “A patient shall also have the right to appeal to the director any decision to which he objects relating to his care and treatment at the facility.”

. This and other decisions of the Court of Claims may be found on the court’s Web site: www.nyscourtofclaims.state.ny.us.